## In re EUCLID DOAN CO.

## NATIONAL CITY BANK OF CLEVELAND v. EUCLID DOAN CO. (HARVEY, Intervener).

### No. 8018.

Circuit Court of Appeals, Sixth Circuit.

June 9, 1939.

Clan Crawford, of Cleveland, Ohio (Squire, Sanders & Dempsey, H. J. Crawford, Paul J. Bickel, and Frank Harrison, all of Cleveland, Ohio, on the brief), for appellant.

Morris Berick, of Cleveland, Ohio (Halle, Harris, Haber & Berick, of Cleveland, Ohio, on the brief), for appellees.

Before HICKS, ALLEN, and HAMILTON, Circuit Judges.

HICKS, Circuit Judge.

This appeal involves an issue similar to those considered in Commissioner v. H. F. Neighbors Realty Co., 6 Cir., 81 F.2d 173, and in Commissioner v. F. & R. Lazarus & Co., 6 Cir., 101 F.2d 728, namely: The status of the transaction whereby a debtor raised money upon real estate by divesting itself of the fee, but retaining possession under a renewable ninety-nine year lease from the grantee, who as trustee, issued land trust certificates of equitable interests in the property to third parties.

Those were tax cases. Here the controversy is ancillary to a proceeding for the reorganization of the debtor under Sec. 77B of the Bankruptcy Act, 11 U.S.C.A. § 207.

On June 9, 1937, the day after the debtor's petition was approved, appellant, successor-trustee to The Guardian Trust Company, filed its ancillary petition in the nature of reclamation alleging that the debtor had defaulted in its payments provided in the lease and praying for an adjudication that the leasehold be terminated and for an injunction against the debtor from disturbing it in its possession of the premises. The debtor alleged in its answer that the whole transaction was intended to secure a loan, by conveyance of title to Guardian, and that if the loan should be paid off, title would revert to the debtor. It denied that the trustee was in possession. The Master found that the transaction was not intended as a sale, but was designed to secure a loan, for which Guardian took title to the real property as security. The court confirmed these findings and denied relief. Hence this appeal.

The debtor, since 1904, was in the business of owning and leasing contiguous properties in Cleveland. Its income was derived from rentals, the tenants sometimes paying directly to it and sometimes to the Euclid 105th Properties Company, a lessee. The buildings, which the debtor constructed, rested partly on land it owned and partly on leased premises, no attempt being made to conform the walls to the property lines.

In 1922 the debtor placed a $2,000,000 first mortgage with Guardian on twelve lots, ten of which are here involved. In 1928 the bonds secured by this mortgage had seven or eight years to run but they were being paid as they became due. The mortgage then amounted to $1,200,000 with a second mortgage of $500,000. Harvey, a large stockholder of the debtor, testified that House, President of Guardian, not a

witness, urged the debtor to convert the bonds into land trust certificates bearing 5% instead of the 6% then being paid as interest. "When the offer was made by Mr. House, I said we didn't like to deed our property to The Guardian Trust Company, it looked as if we were parting with title. He said, no, that was just a paper title, that the real title still remained in yourself if you still made these yearly payments."

Harvey testified further that Goodman of the Properties Company, discussed the proposal with Whitcomb, attorney for Guardian, who also did not testify, and that Whitcomb finally convinced Goodman that it would lessen the interest rate and that "we were not parting with the property, and by these monthly or yearly payments in the course of thirty years would be back in our possession again."

George F. Johnson, Vice-President of Guardian, in charge of securities and the only witness for appellant who testified touching the negotiations, said that he never told Harvey that a land trust certificate issue would be the same as a mortgage and never heard any one else do so, but he admitted that he was taking up some unmatured bond issues and replacing them with a lower rate security and that land trust certificates were popular securities at that time. It was understood that they were non-taxable.

Pursuant to these negotiations, the debtor, on May 8, 1928, sold $1,375,000 of land trust certificates to Guardian and Union Trust Company, underwriters, for $1,295,000. It carried these certificates on its books as a debt. The certificates were afterwards sold to the investing public. On the same day the debtor executed a warranty deed conveying the ten properties it owned in fee to Guardian for a stated consideration of $100.

On May 24, 1928, Guardian, as trustee, leased the conveyed premises to the debtor for ninety-nine years, renewable at the option of the debtor. The annual rental was fixed at $68,750; being $50 for each of the 1,375 land trust certificates resold by Guardian at $1,000 each and representing 1/1375 interest in the tracts conveyed. The debtor agreed to pay all the taxes, special assessments, etc., on the premises and to maintain the buildings in repair at its expense. In addition, it agreed to pay the trustee $1,700 a year for its services, and to pay $6,875 per annum until May 15, 1935, and $13,-

750 annually thereafter into a depreciation fund until its accumulations should aggregate $1,000,000 the payments to be invested by the trustee as security for debtor's performance. If the debtor exercised its option to purchase back the premises or any part thereof, the certificates could be purchased out of the fund at figures ranging from $1,416.25 prior to May 15, 1931, to $1,388.75 after May 15, 1938. The lease provided also that if the debtor should elect to purchase a particular tract, the value of the land and buildings remaining subject to the lease should be equal to, or in excess of, 225% of the value of outstanding trust certificates.

The Properties Company joined in the lease, making itself liable with the debtor for payment of the rents and performance of other covenants and conditions.

Section 4 of Article V of the lease empowered the trustee, in event of default in payment of rents, depreciation fund, etc., over a period of sixty days, to give notice, specifying the default, and at the end of sixty days thereafter, to elect "to declare the term ended and to enter upon the * * premises and take immediate possession of the same together with all buildings and improvements thereon, with or without process of law, forcibly or otherwise, and to expel, remove or put out the Lessee * * * using all force and means that may be necessary for so doing. * * *"

Clause (a) of Article VI expressly declared that the property was conveyed and the Declaration of Trust executed "in connection with the payment or refinancing of indebtedness of Euclid-Doan Company. * * *" On the same day, May 24, 1928, Guardian, as trustee, executed its Declaration of Trust dividing the equitable ownership and financial interest in the trust estate into 1,375 indivisible parts and issuing certificates of equitable ownership in evidence thereof. By its provisions, the trustee assumed the exclusive right to control the trust estate, free from all direction by the beneficiaries, to terminate the lease and sell the estate in event of default or to take such other action or exercise such other remedies as it might deem advisable.

In aid of the sale of the certificates Guardian issued a prospectus based upon information supplied by the debtor to the effect that the property was favorably situated in the second largest retail business district in Cleveland and consisted of land appraised at $1,598,790 with buildings ap-

praised at $825,000 and the value of the leasehold appraised at $325,000; that the net income from all the property available for the rental payments of $68,750 was $134,521.23 for the year 1927.

About 1931 the Properties Company defaulted in its payments to the debtor, with consequent default of the debtor to the trustee. Various arrangements were made to cut down expenses and collect as much as possible for the certificate holders.

On March 29, 1935, about three months after its designation as successor-trustee, appellant addressed a joint letter to the debtor and Properties Company giving notice of the delinquencies in rent, tax and depreciation fund payments and proposing an arrangement whereby the Properties Company might continue to collect rents and deposit them but could not check them out without the countersignature of a representative of the trustee. In the early part of 1937 an attempt to revise the lease, and to write down the rentals, failed when the debtor was unable to make repairs on the property.

By May 21, 1937, the debtor's default for rents and depreciation fund payments was around $400,000. On that date apparently without giving any further notice than that we have recounted, appellant wrote letters to both companies, cancelling the lease, and attempted to enter upon the property and seize control of it. This met with opposition from the debtor; and although the appellant managed to open an office in one of the buildings, it did not gain undisputed possession. During this period, appellant and debtor each gave orders to service employees, and each attempted to collect rents from the tenants, with temporary demoralization to both.

The debtor apparently prevailed, since Harvey testified that from May 21 to June 7, 1937, the collections were highest for a similar period in over three years and that when the books were closed in May there was less delinquency among the tenants by $2,000 than when the books were closed in April.

■ We are not at liberty to overturn the concurrent findings of the Master and the Judge that the transactions of May, 1928, between the debtor and Guardian were not intended as a sale of the debtor's property but were intended to secure a loan and that the deed of May 8 executed by the debtor to Guardian was intended to secure repayment of the loan and that the lease of May 24 by Guardian to the debtor was a part of the same transaction and for the same purpose. There is no showing of a clear mistake in the findings.

■ The Master pointed out that the indicia of such intention were, among others, —(1) the prior debt of the debtor; (2) its financial embarrassment; (3) that Guardian was a money lender; (4) that the original intention of the debtor was to obtain a loan; (5) the inadequacy of the consideration for the deed; (6) the continued payment by debtor of the taxes; (7) that reconveyance was to be made upon repayment of the precise amount of the consideration with interest; (8) payment by debtor in possession of rent equal to interest payable on the certificates; and (9) obligation to pay a definite amount.

■ We fail to discover in the record any basis for a conclusion different from that arrived at. Equity has inherent jurisdiction to declare a deed to be a mortgage and the Bankruptcy Court is by statute vested with equity jurisdiction. We think the case must be aligned with the Neighbors and Lazarus cases. A restatement of the opinions in these cases would be surplusage.

■ Finally, it is pressed upon us that by its representations in the prospectus above mentioned that the fee in the property was held by the trustee subject to a lease to the debtor, appellee was estopped from asserting that it was a mortgagor. Certainly this cannot be true as between appellant and appellee, else no deed could ever be declared to be a mortgage, as intended, between the parties.

■ One may by his conduct exclude himself from asserting his title to lands but only upon clear and satisfactory grounds of both justice and equity. The party asserting estoppel must be able to show that he has been injured by the conduct of the other party and that he had no knowledge or means of knowledge of the truth.

The decree is affirmed and the case remanded for further proceedings consistent herewith.