## COMMISSIONER OF INTERNAL REVENUE v. F. & R. LAZARUS & CO.

## F. & R. LAZARUS & CO. v. COMMISSIONER OF INTERNAL REVENUE.

### Nos. 7686, 7687.

Circuit Court of Appeals, Sixth Circuit.

Feb. 16, 1939.

Helen R. Carloss, of Washington, D. C. (James W. Morris, Sewall Key, Norman D. Keller, and S. Dee Hanson, all of Washington, D. C., on the brief), for the Commissioner of Internal Revenue.

Robert P. Goldman and Harry Stickney, both of Cincinnati, Ohio (Paxton & Seasongood, of Cincinnati, Ohio, on the brief), for F. & R. Lazarus & Co.

Before HICKS, ALLEN and HAMILTON, Circuit Judges.

HICKS, Circuit Judge.

These cases were consolidated before the Board of Tax Appeals and involve the redetermination of deficiencies in the income tax of the F. & R. Lazarus & Company (herein called the Company) in the amounts of $3084 for 1930, and $10,349.39 for 1931. The issues were, the right of the Company (1) to take depreciation on buildings occupied under a 99-year lease (the first case) and (2) to deduct as ordinary and necessary business expenses certain charitable contributions (the second case).

The Board allowed the deductions for depreciation, reducing the allowance slightly, and the Commissioner seeks to review that decision; but it denied the deductions.

for charitable contributions, which action the Company seeks to review.

No. 7686. The Company, an Ohio corporation, operated the largest department store in Columbus. It conducted its business in three buildings. Two of them were on land it owned in fee, and the third on lots held under ninety-nine year leases with options to purchase. It had constructed the three buildings at an approximate cost of two and one-half million dollars.

To finance the construction of the largest of the buildings the Company had, in 1926, borrowed $1,700,000 from the Northwestern Mutual Life Insurance Company on a ten-year mortgage. In 1928 it purchased the controlling stock in the John Shillito Company of Cincinnati and financed this purchase by issuing short term notes due in six months for approximately a million and a half dollars. These notes were bought by the A. G. Becker & Company.

Desiring to reduce its current indebtedness, the Company's board, in May, 1928, instructed its Secretary-Treasurer to endeavor to cancel the Northwestern mortgage and " * * * to negotiate another and larger first mortgage for a period not less than twenty-five years or a so-called 'Fee Certificate' issue; either plan to provide an amount in excess of $3,000,000.00 in order to cover the refunding of the Northwestern Mutual Life Insurance Company mortgage, and to provide * * * funds necessary for the acquisition of the Shillito interests. * * *"

B. G. Huntington, President of the Huntington National Bank of Columbus, from which the loan was obtained, testified that it was negotiated in the form of a land trust certificate issue and that this was almost the only possible plan because of the local taxation on mortgage bonds.

The plan worked out with the Bank took effect on June 1, 1928. Thereunder the Company in a transaction involving the borrowing of $3,250,000 less discount, gave the Bank, as Trustee, a deed in fee simple and free from incumbrances, to the property held in fee, and assignments of the title to the two ninety-nine year leases.

The mortgage to Northwestern was paid and the Bank as Trustee leased all the property involved to the Company for ninety-nine years, renewable with an option to purchase at stated scheduled prices.

The Trustee issued 3,500 separate "Certificates of Equitable Ownership" each representing 1/3500 of the equitable ownership and beneficial interest in the property.[1] The Trustee executed a "Declaration of Trust" reciting that it held title to the real estate in trust for the owners of the certificates and that it would pay to each certificate holder his pro rata share of the net proceeds of the property derived by the Trustee from the annual rental of $175,000 paid by the Company and amounting to $50 for each certificate.

In its returns for the years involved the Company claimed an annual depreciation on the three buildings occupied by it under the lease of $61,698.14 based upon a useful life of forty years and being $2\frac{1}{2}\%$ of the investment of approximately two and a half million dollars. The Commissioner disallowed any deduction for depreciation on the ground that the right to take depreciation followed the legal title.

The Company insists that, although its deed to the Bank as Trustee was absolute in form, the transaction was in reality a mortgage to secure a loan and that it therefore retained its right to take deductions for exhaustion, wear and tear of the property conveyed, including a reasonable allowance for obsolescence. Rev. Act 1928, Ch. 852, Sec. 23(k), 45 Stat. 791, 800, 26 U.S.C.A. § 23 (l).

The facts are similar to those in Commissioner of Internal Revenue v. H. F. Neighbors Realty Co., 6 Cir., 81 F.2d 173, in which this court treated a deed absolute in form as a mortgage for the purpose of determining whether the transaction in question was a loan or sale resulting in taxable gain. In the Neighbors case bonds were about to mature and other obligations were coming due which needed refinancing; here there was an unmatured mortgage and a large number of short term notes which it was necessary to bring into one obligation. In each case the ratio of

[1] The difference between the three and a quarter million dollars actually borrowed and the three and one-half million dollars of the certificates issued is explained by the fact that certificates amounting to $^{250}/_{3500}$ of the equitable ownership were held by the Trustee in trust for the other holders until November 1, 1940, which the Company might redeem for $250,000 provided it could procure a conveyance of fee simple titles to the Trustee to the two parcels originally acquired by it under lease.

the appraised value of the property conveyed to the amount of trust certificates issued thereon was roughly the same, being in round numbers two million dollars to nine hundred fifty-five thousand dollars, in the Neighbors case, and six and one-half million to three and one-half million here. In the Neighbors case the interest rate paid on the thousand certificates out of the fixed annual rental amounted to 5½%. Here the Company agreed to pay the Trustee during the term of the lease an annual rental of $175,000 on the 3,500 certificates, or actually $162,500 on 3,250 certificates, in addition to the rentals payable under the original leases on parcels 2 and 3. Distributed pro rata, this provided an income of 5% on each certificate. In addition, the Company agreed to pay all taxes, etc., which might be levied on the leased premises. In the Neighbors case, as in this, the taxpayer had the option (1) to renew the lease for ninety-nine years in perpetuity; or (2) to redeem the certificates after the lapse of a certain time (10 years in the Neighbors case and 5 years here) at $1,000 plus a premium, graduated according to the time the certificates were purchased.

But there is an important additional feature here which was not present in the Neighbors case. There, as we have noted, the taxpayer had the right to buy up the certificates, but no sinking fund to amortize the indebtedness was set up. Here there was established a Depreciation Fund (really an amortization fund not to be confused with the depreciation on buildings for which the deduction was claimed) payable at a rate, not less than $16,250 a quarter in cash or certificates, sufficient to amortize the indebtedness in 48½ years, but limited to a total accumulation of $2,-600,000 to conform to a ruling of the Attorney General for the State of Ohio. At the date of the hearing before the Board the Company had already acquired in open market sufficient certificates to pay sinking fund requirements for the next sixteen years.

Aside from the deed in fee simple from respondent to the Bank as Trustee, there was no evidence that the transaction was intended as an absolute sale. Neither Fred Lazarus, Jr., Vice-President of the Company, nor Lowry Sweeney, Manager of the Bank's bond department, considered that the Bank was purchasing the property. Lazarus testified that he would not have sold property, valued in excess of six million dollars, to the Bank for approximately three and a quarter million dollars, and Sweeney said that he "considered we were doing a financing job for the F. & R. Lazarus & Company." The Company did a gross business of twelve million dollars annually. It set up on its books charges of $375,000 annually to rental, over twice what it paid as interest on the certificates, and in line with six and a half million dollars' appraisal which had been placed on the properties.

All of these facts: The long life of the Company; the fact that it had constructed the buildings to suit its own needs and was expanding its business in other communities; that it was setting out to liquidate the indebtedness through the Depreciation Fund and thus reacquire title to the properties; in addition to the authority of the Neighbors case, to which we adhere, support our conclusion that no absolute conveyance was intended and that the Company did not lose its right to make deductions for exhaustion of property conveyed.

The decision of the Board of Tax Appeals is affirmed.

We are not unmindful of the contrary holding in City National Bank Building Co. v. Helvering, 68 App.D.C. 344, 98 F.2d 216. In that case the court was unable to follow our opinion in the Neighbors case largely because it arrived at a different conclusion as to the effect to be attributed to the case of Senior v. Braden, 295 U.S. 422, 55 S.Ct. 800, 79 L.Ed. 1520, 100 A.L.R. 794.

No. 7687. For the year ending January 31, 1930, the Company made the following contributions, to:

Columbus Community Fund.... $18,000.00
Salvation Army .............. 1,000.00
White Cross Hospital.......... 1,000.00
and for the year ending January 31, 1931, to:
Columbus Community Fund.... $18,166.67
Salvation Army .............. 1,000.00

The Company sought to deduct these amounts from its return for those years as ordinary and necessary business expenses. Rev. Act 1928, Ch. 852, 45 Stat. 791, 799, Sec. 23(a) 26 U.S.C.A. § 23(a). Its claim was founded on the fact that business houses were solicited on the basis of a showing of actual benefits received by their employees from the fund. Lazarus, who was one of the founders of the fund, and active in its work, testified: "Ten dollars

per employee was considered the amount that should be paid under normal business conditions. * * *"

The evidence is that the population of Columbus was approximately 300,000. The Company employed from 1,400 to 1,600 people and claimed that 20 to 25% of that number were in active contact with the social and health activities of the Community Fund. The only definite figures came from a survey of 199 employees of the Company made in 1928. Of these "35 of the persons on the list, either personally or through their immediate families, had received help from the welfare agencies," exclusive of the hospitals and character building and recreational organizations which the survey did not cover. However, Fred C. Croxton, Community Fund director in 1928, stated that the facilities and services of the Community Fund were open to all citizens of Columbus and that no particular preference was given employees of the Company.

Aside from the direct benefit to its employees, resulting from these contributions, the Company claimed that since it was the largest retail department store in the community, it was of fundamental importance to its business to participate in the activities which made Columbus a better city and increased the opportunities for business; and that its contributions which were large and which always received favorable publicity, were important to it from the standpoint of the goodwill of its customers, many of whom, Lazarus testified, were deeply interested in the subject of social service.

Prior to the Revenue Act of 1935, only individuals, not corporations, were permitted to take deductions for charitable and other contributions. Rev. Act 1928, Ch. 852, 45 Stat. 791, 800, Sec. 23(n) (2), 26 U.S.C.A. § 23 note. But Article 262, Treas. Reg. 74, promulgated under that Act, provided in part,—

"Donations by corporations.—Corporations are not entitled to deduct from gross income contributions or gifts which individuals may deduct under section 23(n). Donations made by a corporation for purposes connected with the operation of its business, however, when limited to charitable institutions, hospitals, or educational institutions conducted for the benefit of its employees or their dependents are a proper deduction as ordinary and necessary business expenses. Donations which legiti-mately represent a consideration for a benefit flowing directly to the corporation as an incident of its business are allowable deductions from gross income."

Contributions, such as these, to be deductible as ordinary and necessary business expense, must result in direct benefit to the employees of the Company or their dependents; and whether they benefited directly from the Company's contributions to the Community Fund is a question of fact. Old Mission Portland Cement Co. v. Helvering, Commr., 293 U.S. 289, 294, 55 S.Ct. 158, 79 L.Ed. 367.

The only non-conjectural evidence on the subject was derived from a sampling of the Company's employees in 1928, when thirty-five out of the one hundred and ninety-nine questioned, or members of their families, were helped by agencies participating in the Fund. This was less than 20% of the families represented by the Company's 1,600 employees. Assuming there were five persons in each family helped, this would aggregate only 1,500 to 1,600 people of the 300,000 in Columbus, or about one-half of one per cent. Such aid to its employees is indirect and entirely too remote [Morgan Constr. Co. v. United States, 18 F.Supp. 892, D.C.] and was not the easily traceable benefit sanctioned by us in American Rolling Mill Co. v. Commr., 6 Cir., 41 F.2d 314, where the taxpayer employed half of the wage earners of the city and contributed over one-third of the civic improvement fund. See, also, Corning Glass Works v. Lucas, 59 App.D.C. 168, 37 F.2d 798, 68 A.L.R. 736. In Old Mission Portland Cement Co. v. Helvering, Commr., supra, the same contention was made as here, that the gifts resulted in goodwill to the taxpayer, but the Supreme Court there said that there must be evidence of direct benefit to the taxpayer's business.

In Helvering v. Evening Star Newspaper Co., 4 Cir., 78 F.2d 604, the taxpayer was a newspaper which gave ardent support to the cause of the Community Chest and sought to deduct its contributions thereto on the ground that its prestige was thereby enhanced and that it would have suffered had it not contributed in a liberal manner. The court said, at page 605, "Whether the contributions resulted in an increase in the circulation or advertising of the Star, and, if any, to what extent, is of necessity mere conjecture. The evidence falls far short of establishing either

proposition. If any benefit, in either respect, did accrue, it is so indirect and remote that it cannot rise to the dignity of being substantial, nor warrant a finding that the donations involved were, in a general sense, necessary and ordinary, expenses within the meaning of section 23 of the Revenue Act of 1928 (26 U.S.C.A. § 23) or of the Treasury Regulations 74. * * *"

The same reasoning applies here. There is no showing of direct and tangible benefits to the Company or of new business secured thereby as in the contribution to the Y. M. C. A. in Old Mission Portland Cement Co. v. Commr., 9 Cir., 69 F.2d 676, and no showing of existing contracts retained as in Fairmont Creamery Corp. v. Helvering, 67 App.D.C. 66, 89 F.2d 810. The Company insisted that its patronage would have been hurt if the contributions had not been made and conceivably this would have been true but evidence of damages was remote. The question is one of fact and we find no evidence to upset the finding of the Board. Its decision is therefore affirmed.