**Kapel GOLDSTEIN and Tillie Goldstein, Petitioners,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 187, Docket 29957.**

United States Court of Appeals Second Circuit.

Argued Feb. 23, 1966.

Decided July 22, 1966.

I. Meyer Pincus, New York City, for petitioners.

Jonathan S. Cohen, Atty., Dept. of Justice, Richard M. Roberts, Acting Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Martin G. Goldblum, Attys., Dept. of Justice, for respondent.

Before WATERMAN, MOORE and. FRIENDLY, Circuit Judges.

WATERMAN, Circuit Judge.
Tillie Goldstein and her husband [1] peti-

---

1. Tillie Goldstein, whose income is involved here, filed a joint return with her husband, Kapel Goldstein, for the calender year 1958. Therefore, though husband and wife are joint petitioners in the case, we use "petitioner" throughout this opin-

tion to review a decision of the Tax Court disallowing as deductions for federal income tax purposes payments totaling $81,396.61 made by petitioner to certain banks, which payments petitioner claimed were payments of interest on indebtedness within Section 163(a) of the 1954 Internal Revenue Code. This section provides that "There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." Int.Rev.Code of 1954 § 163(a).[2] A majority of the Tax Court held for several reasons to be considered in the body of this opinion that these payments were not deductible. Goldstein v. Commissioner, 44 T.C. 284 (1965). We affirm on one of the grounds mentioned by the Tax Court.

During the latter part of 1958 petitioner received the good news that she held a winning Irish Sweepstakes ticket and would shortly receive $140,218.75. This windfall significantly improved petitioner's financial situation, for she was a housewife approximately 70 years old and her husband was a retired garment worker who received a $780 pension each year. In 1958 the couple's only income, aside from this pension and the unexpected Sweepstakes proceeds, was $124.75, which represented interest on several small savings bank accounts. The petitioner received the Sweepstakes proceeds in December 1958 and she deposited the money in a New York bank. She included this amount as gross income in the joint return she and her husband filed for 1958 on the cash receipts and disbursements basis.

Petitioner's son, Bernard Goldstein, was a certified public accountant, practicing in New York in 1958. In November of that year Bernard either volunteered or was enlisted to assist petitioner in investing the Sweepstakes proceeds,

and in minimizing the 1958 tax consequences to petitioner of the sudden increase in her income for that year. A series of consultations between Bernard and an attorney resulted in the adoption of a plan, which, as implemented, can be summarized as follows: During the latter part of December 1958 petitioner contacted several brokerage houses that bought and sold securities for clients and also arranged collateral loans. With the assistance of one of these brokerage houses, Garvin, Bantel & Co., petitioner borrowed $465,000 from the First National Bank of Jersey City. With the money thus acquired, and the active assistance of Garvin, Bantel, petitioner purchased $500,000 face amount of United States Treasury ½% notes, due to mature on October 1, 1962. Petitioner promptly pledged the Treasury notes so purchased as collateral to secure the loan with the Jersey City Bank. At approximately the same time in 1958 Bernard secured for petitioner a $480,000 loan from the Royal State Bank of New York. With the assistance of the Royal State Bank petitioner purchased a second block of $500,000 face amount of United States Treasury 1½% notes, due to mature on October 1, 1961. Again the notes were pledged as collateral with this bank to secure the loan. Bernard testified that the petitioner purchased the Treasury notes because he believed "the time was ripe" to invest in this kind of government obligation. Also, pursuant to the prearranged plan, petitioner prepaid to the First National Bank of Jersey City and to the Royal State Bank the interest that would be due on the loans she had received if they remained outstanding for 1½ to 2½ years. These interest prepayments, made in late December of 1958, totaled $81,396.61.[3] Petitioner then

---

ion to indicate this fact and to show that Kapel Goldstein is involved only because of the filing of the joint return.

2. Unless otherwise stated, all references to Code sections are to the 1954 Internal Revenue Code. Hereafter the Code will usually be referred to only by Section.

3. The prepaid interest on the Jersey City Bank loan totaled $52,596.61 and covered a future period of two years and 9½ months; the prepaid interest on the Royal State Bank loan totaled $28,800 and covered a future period of 1½ years.

claimed this sum as a Section 163(a) deduction on the 1958 income tax return she filed jointly with her husband.

After reviewing these transactions in detail the Tax Court held the $81,396.61 was not deductible as "interest paid or accrued" on "indebtedness" under Section 163(a). In large part this holding rested on the court's conclusion that both loan transactions were "shams" that created "no genuine indebtedness." To support this conclusion the court stressed that, even though petitioner was borrowing approximately one half million dollars from each bank, the banks had agreed to the loans without any of their officers or employees having met petitioner or having investigated her financial position. The court noted that in each of the loan transactions petitioner was not required to commit any of her funds toward the purchase of the Treasury notes in their principal amount. And at several points the court appears to have attached great weight to the fact that most of the relevant transactions were apparently conducted by Garvin, Bantel and the Jersey City Bank, or by Bernard and the Royal State Bank, without petitioner's close supervision. Taking all these factors together, the Tax Court decided that, in fact, each transaction was " * * * an investment *by the bank* in Treasury obligations; wherein the bank, in consideration for prepayment to it of 'interest' by a customer * * * would carry such Treasury notes in the customer's name as purported collateral for the 'loan.'" 44 T.C. at 299 (italics in original). The court went on to say that " * * * if it is necessary to characterize the customer's payment, we would say that it was a fee to the bank for providing the 'facade' of a loan transaction." *Ibid.*

There is a certain force to the foregoing analysis. Quite clearly the First National Bank of Jersey City and the Royal State Bank of New York preferred to engage in the transactions they engaged in here rather than invest funds directly in Treasury notes because petitioner's loans bore interest at an appreciably higher rate than that yielded by the government obligations. This fact, combined with the impeccable property pledged as security for the loans, may have induced these banks to enter into these transactions without all the panoply that the court indicates usually accompanies loan transactions of such size. Indeed, while on its face purporting to be a debtor-creditor transaction between a taxpayer and a bank, in fact there can be a situation where the bank itself is, in effect, directly investing in the securities purportedly pledged by taxpayer as collateral to taxpayer's obligation; in such a transaction the taxpayer truly can be said to have paid a certain sum to the bank in return for the "facade" of a loan transaction. For Section 163(a) purposes such transactions are properly described as "shams" creating no "genuine indebtedness" and no deduction for the payment of "interest" to the bank should be allowed. See cases cited note 5 *infra*. Cf. Knetsch v. United States, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960).

In our view, however, the facts of the two loan arrangements now before us fail in several significant respects to establish that these transactions were clearly shams. We agree with the dissent below that the record indicates these loan arrangements were " * * * regular and, moreover, indistinguishable from any other legitimate loan transaction contracted for the purchase of Government securities." 44 T.C. at 301 (Fay, J., dissenting). In the first place, the Jersey City Bank and the Royal State Bank were independent financial institutions; it cannot be said that their sole function was to finance transactions such as those before us. Compare Lynch v. Commissioner of Internal Revenue, 273 F.2d 867 (2 Cir. 1959); Goodstein v. Commissioner of Internal Revenue, 267 F.2d 127 (1 Cir. 1959). Second, the two loan transactions here did not within a few days return all the parties to the position from which they had started. *Ibid.* Here the Royal State Bank loan remained outstanding, and, significantly, that Bank retained the Treasury obligations pledged as security until June 10, 1960, at

which time petitioner instructed the bank to sell the notes, apply the proceeds to the loan, and credit any remaining balance to her account. The facts relating to the Jersey City Bank loan are slightly different: this loan was closed in June 1959 when the brokerage house of Gruntal & Co. was substituted for the Jersey City Bank as creditor. Gruntal received and retained the 1962 Treasury 1½'s originally pledged as security for the loan until December 1, 1959 when, pursuant to instructions from petitioner and her advisors, these notes were sold, and $500,-000 face amount of United States Treasury 2½% bonds were purchased to replace them as security. Petitioner's account with Gruntal was not finally closed until June 13, 1960 when the last of these substituted bonds were sold, the petitioner's note was marked fully paid, and the balance was credited to petitioner. Third, the independent financial institutions from which petitioner borrowed the funds she needed to acquire the Treasury obligations possessed significant control over the future of their respective loan arrangements: for example, the petitioner's promissory note to the Jersey City Bank explicitly gave either party the right to accelerate the maturity of the note after 30 days, and it was the Jersey City Bank's utilization of this clause that necessitated recourse to Gruntal; the Royal State Bank had the right at any time to demand that petitioner increase her collateral or liquidate the loan, and on several occasions it made such a demand. Fourth, the notes signed by petitioner in favor of both banks were signed with recourse. If either of the independent lending institutions here involved had lost money on these transactions because of the depreciation of the collateral pledged to secure the loans we are certain that, upon petitioner's default of payment, they would have without hesitation proceeded against petitioner to recover their losses. Compare Lynch v. Commissioner of Internal Revenue, supra (nonrecourse

notes). See also Jockmus v. United States, 335 F.2d 23 (2 Cir. 1964). Moreover, all things being equal, the banks' chances of judgments in their favor would have been excellent. In view of this combination of facts we think it was error for the Tax Court to conclude that these two transactions were "shams" which created no genuine indebtedness. Were this the only ground on which the decision reached below could be supported we would be compelled to reverse.

In reaching this conclusion we recognize that at least one other United States Court of Appeals has disallowed a deduction for interest in a closely analogous case on the ground the transactions there were "sham." Bridges v. Commissioner of Internal Revenue, 325 F.2d 180 (4 Cir. 1963).[4] We think the interest of candor is better served if the "sham" and "absence of indebtedness" rationales are reserved for cases like Lynch v. Commissioner of Internal Revenue, supra, and Goodstein v. Commissioner of Internal Revenue, supra. Different considerations govern decision as to whether interest payments are deductible by a taxpayer who borrows money from an independent lending institution, executes a promissory note with recourse, and purchases Treasury obligations that are then in fact pledged with the lender as security for the loan for a significant period of time, unless it can be concluded from other facts (not present in this case) that the transaction is simply a sham.

One ground advanced by the Tax Court seems capable of reasoned development to support the result reached in this case by that court. The Tax Court found as an ultimate fact that petitioner's purpose in entering into the Jersey City Bank and Royal State Bank transactions "was not to derive any economic gain or to improve here [sic] beneficial interest; but was *solely* an attempt to obtain an interest deduction as an offset to her sweepstake winnings." 44 T.C. at 295 (emphasis added). This finding of ul-

---

4. Judge Boreman's opinion in *Bridges* is somewhat ambiguous; at times it would appear that it adopts a rule similar to that which we adopt in the present case. Compare 325 F.2d at 184 with our discussion at 741, *infra*.

timate fact was based in part on a set of computations made by Bernard Goldstein shortly after the Jersey City Bank and Royal State Bank loan transactions had been concluded. These computations were introduced by the Commissioner below and they indicated that petitioner and her financial advisors then estimated that the transactions would produce an economic loss in excess of $18,500 inasmuch as petitioner was out of pocket the 4% interest she had prepaid and could expect to receive 1½% interest on the Treasury obligations she had just purchased plus a modest capital gain when the obligations were sold. This computation also reflected Bernard's realization that if the plan was successful this economic loss would be more than offset by the substantial reduction in petitioner's 1958 income tax liability due to the large deduction for interest "paid or accrued" taken in that year. The memorandum drawn up by Bernard is set out in full in the opinion of the Tax Court. 44 T.C. 292–293. In fact, petitioner sustained a $25,091.01 economic loss on these transactions for some of the Treasury obligations were ultimately sold for less than the price that had been originally anticipated by petitioner's advisors.

Before the Tax Court, and before us, petitioner has argued that she realistically anticipated an economic gain on the loan transactions due to anticipated appreciation in the value of the Treasury obligations, and that this gain would more than offset the loss that was bound to result because of the unfavorable interest rate differential. In support of this position, Bernard testified, and documentary evidence was introduced, to the effect that in December 1958 the market for Treasury obligations was unreasonably depressed, and that many investors at that time were favorably disposed toward their purchase. In short, petitioner argued that she intended a sophisticated, speculative, sortie into the market for government securities.

In holding that petitioner's "sole" purpose in entering into the Jersey City Bank and Royal State Bank transactions was to obtain an interest deduction, the Tax Court rejected this explanation of her purpose in entering into these transactions. For several reasons we hold that this rejection was proper. First, petitioner's evidence tending to establish that she anticipated an economic profit on these transactions due to a rising market for Treasury obligations is flatly contradicted by the computations made by Bernard contemporaneously with the commencement of these transactions and introduced by the Commissioner at trial. These computations almost conclusively establish that petitioner and her advisors from the outset anticipated an economic loss. Petitioner's answer to this damaging evidence is that the set of Bernard's computations introduced by the Commissioner was only one of several arithmetic projections made at the same time by Bernard, and that Bernard intended the computations introduced by the Commissioner to represent the worst that could befall the plan if prices for government obligations continued to decline. The petitioner introduced several exhibits that purported to be reconstructions of the other arithmetic projections made by Bernard contemporaneously with the computations introduced by the Commissioner. Exhibit 83, introduced by petitioner, purported to be an arithmetic projection of petitioner's expected profit on the assumption that the market for Treasury obligations remained at the level it had reached at the close of 1958; this exhibit showed an economic profit on both transactions over a two-year period totaling a meager $2,075.00. Exhibit 84, also introduced by petitioner, purported to be an arithmetic projection of petitioner's expected profit on the assumption that the market for Treasury obligations reverted to previous highs; this exhibit projected an economic profit on both transactions over a two year period totaling $22,875.00. The Tax Court's ground (or grounds) for refusing to credit these exhibits and related evidence does not clearly appear in its opinion, but sufficient grounds are not hard to find. First, unlike the computations

made by Bernard that the Commissioner introduced, Exhibits 83 and 84 purported only to be reconstructions of calculations made by Bernard in late December 1958. The originals of Exhibits 83 and 84 were not produced; no explanation of petitioner's failure to do so was given. On this ground the Tax Court might have decided that Exhibits 83 and 84 were especially prepared for this litigation and had not entered into Tillie's calculations at the outset. Second, even if we assume Exhibits 83 and 84 represent computations made contemporaneously with petitioner's entrance into these transactions, they far from establish that the transactions were undertaken with a realistic expectation of economic profit. For example, Exhibit 83 purports to establish that, assuming the market for Treasury obligations remained constant, petitioner and her advisors anticipated an economic profit of $2,075.00 over a two year period on these transactions. But Exhibit 83 fails to reflect the $6,500 fee paid to Bernard and tax counsel for their work in planning these transactions. Once this fee is included in these computations all economic profit disappears. Inclusion of this $6,500 item similarly reduces the total economic profit as computed in Exhibit 84. Furthermore, although petitioner made an outlay of "prepaid interest" on the Royal State Bank loan for a period of 1½ years, Exhibits 83 and 84 compute the outlay on this loan as if there had been an interest payment for only one year. The payment of interest on the Jersey City Bank loan similarly is computed on a two-year basis instead of the basis of the actual outlay, which extended for two years, nine and one half months. Such computations presuppose petitioner could, at her option, terminate the loans prior to their due dates, sell the securities, and be reimbursed for the portions of the prepaid interest not yet earned by the banks. However, neither loan agreement contains a provision entitling petitioner to be reimbursed for any unearned portion of the prepaid

interest if the loan is terminated *by the petitioner* prior to the due date. And, in the case of the Royal State Bank transaction, it is not even clear that petitioner had the power to prepay the principal of the loan prior to its maturity date. This uncertainty in the consequences of a sale by petitioner of the Treasury obligations prior to their due date might have led the Tax Court to conclude that petitioner and her advisors could not have entertained a realistic hope of economic profit when these loan transactions were commenced. Finally, Exhibit 84 is predicated on the remote possibility that the Treasury obligations could be sold considerably in excess of par, thereby yielding an effective rate of interest well below 1½%, even though it would be unlikely that investors would purchase them for such a small return when they were to mature at par in the near future.

■ For all of the above reasons the Tax Court was justified in concluding that petitioner entered into the Jersey City Bank and Royal State Bank transactions without any realistic expectation of economic profit and "solely" in order to secure a large interest deduction in 1958 which could be deducted from her sweepstakes winnings in that year. This conclusion points the way to affirmance in the present case.

■ We hold, for reasons set forth hereinafter, that Section 163(a) of the 1954 Internal Revenue Code does not permit a deduction for interest paid or accrued in loan arrangements, like those now before us, that can not with reason be said to have purpose, substance, or utility apart from their anticipated tax consequences. See Knetsch v. United States, 364 U.S. 361, 366, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960); Diggs v. Commissioner of Internal Revenue, 281 F.2d 326 (2 Cir.), cert. denied, 364 U.S. 908, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960); Weller v. Commissioner, 270 F.2d 294, 297 (3 Cir. 1959), cert. denied, 364 U.S. 908, 81 S.Ct. 269, 5 L.Ed.2d 223, (1960).[5] Al-

5. We confine our discussion of transactions inspired by tax avoidance motives to those transactions inspired by the lure of Section 163(a)—a section that has proved to

though it is by no means certain that Congress constitutionally could tax gross income, see Surrey & Warren, Federal Income Taxation 228–29 (1960 ed.), it is frequently stated that deductions from "gross income" are a matter of "legislative grace." E. g., Deputy v. DuPont, 308 U.S. 488, 493, 60 S.Ct. 363, 84 L.Ed. 416 (1940). There is at least this much truth in this oft-repeated maxim: a close question whether a particular Code provision authorizes the deduction of a certain item is best resolved by reference to the underlying Congressional purpose of the deduction provision in question.[6]

Admittedly, the underlying purpose of Section 163(a) permitting the deduction of "all interest paid or accrued within the taxable year on indebtedness" is difficult to articulate because this provision is extremely broad: there is no requirement that deductible interest serve a business purpose, that it be ordinary and necessary, or even that it be reasonable. 4 Mertens, Law of Federal Income Taxation § 26.01 (1960 ed.). Nevertheless, it is fair to say that Section 163(a) is not entirely unlimited in its application and that such limits as there are stem from the Section's underlying notion that if an individual or corporation desires to engage in purposive activity, there is no reason why a taxpayer who borrows for that purpose should fare worse from an income tax standpoint than one who finances the venture with capital that otherwise would have been yielding income.

In order fully to implement this Congressional policy of encouraging purposive activity to be financed through borrowing, Section 163(a) should be construed to permit the deductibility of interest when a taxpayer has borrowed funds and incurred an obligation to pay interest in order to engage in what with reason can be termed purposive activity, even though he decided to borrow in order to gain an interest deduction rather than to finance the activity in some other way. In other words, the interest deduction should be permitted whenever it can be said that the taxpayer's desire to secure an interest deduction is only one of mixed motives that prompts the taxpayer to borrow funds; or, put a third way, the deduction is proper if there is some substance to the loan arrangement beyond the taxpayer's desire to secure the deduction. After all, we are frequently told that a taxpayer has the right to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by any means the law permits. E. g., Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935).[7] On the other hand, and notwithstanding Section 163(a)'s broad scope this provision should not be construed to permit an interest deduction when it objectively appears that a taxpayer has borrowed funds in order to engage in a transaction that has no substance or purpose aside from the taxpayer's desire to obtain the tax benefit of

be the Internal Revenue Code's counterpart of the mythical Sirens of the Surrentine promontory. See Minchin v. Commissioner of Internal Revenue, 335 F.2d 30 (2 Cir. 1964); Jockmus v. United States, 335 F.2d 23 (2 Cir. 1964); Dooley v. Commissioner of Internal Revenue, 332 F.2d 463 (7 Cir. 1964); Lewis v. Commissioner of Internal Revenue, 328 F.2d 634 (7 Cir.), cert. denied, 379 U.S. 821, 85 S.Ct. 43, 13 L.Ed.2d 32 (1964); Bridges v. Commissioner of Internal Revenue, 325 F.2d 180 (4 Cir. 1963); Lynch v. Commissioner of Internal Revenue, 273 F.2d 867 (2 Cir. 1959); Goodstein v. Commissioner of Internal Revenue, 267 F.2d 127 (1 Cir. 1959). These cases in-

volve various unsuccessful efforts by taxpayers to claim Section 163(a) deductions for interest paid on indebtedness claimed by taxpayers to be genuine debts.

6. The proposition that because deductions are a matter of "legislative grace" they should be strictly construed is much more doubtful as an interpretative guide. See Note, An Argument Against the Doctrine That Deductions Should be Narrowly Construed as a Matter of Legislative Grace, 56 Harv.L.Rev. 1142 (1943).

7. This area of the law is particularly full of black-letter maxims that prove singularly unhelpful when it comes to deciding cases.

742

an interest deduction: and a good example of such purposeless activity is the borrowing of funds at 4% in order to purchase property that returns less than 2% and holds out no prospect of appreciation sufficient to counter the unfavorable interest rate differential. Certainly the statutory provision's underlying purpose, as we understand it, does not require that a deduction be allowed in such a case. Indeed, to allow a deduction for interest paid on funds borrowed for no purposive reason, other than the securing of a deduction from income, would frustrate Section 163(a)'s purpose; allowing it would encourage transactions that have no economic utility and that would not be engaged in but for the system of taxes imposed by Congress. When it enacted Section 163(a) Congress could not have intended to permit a taxpayer to reduce his taxes by means of an interest deduction that arose from a transaction that had no substance, utility, or purpose beyond the tax deduction. See Knetsch v. United States, supra, 264 U.S. at 367, 81 S.Ct. 132.

In many instances transactions that lack all substance, utility, and purpose, and which can only be explained on the ground the taxpayer sought an interest deduction in order to reduce his taxes, will also be so transparently arranged that they can candidly be labeled "shams." In those instances both the rationale of the decision we announce today, and that of Goodstein v. Commissioner of Internal Revenue, supra, and its progeny, are available as grounds for disallowing the deduction. The present case makes plain, however, that these rationales are distinct from each other, and that a court need not always first label a loan transaction a "sham" in order to deny a deduction for interest paid in connection with the loan.

In Knetsch v. United States, supra, 264 U.S. at 365, 81 S.Ct. 132, the Supreme Court cautions us, by reiteration there of what the Court had said in Gregory v.

Helvering, supra, 55 S.Ct. at page 267 at 469, that in cases like the present "the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended." We here decide that Section 163(a) does not "intend" that taxpayers should be permitted deductions for interest paid on debts that were entered into solely in order to obtain a deduction. It follows therefore from the foregoing, and from the Tax Court's finding as a matter of "ultimate" fact that petitioner entered into the Jersey City Bank and Royal State Bank transactions without any expectation of profit and without any other purpose except to obtain an interest deduction, and that the Tax Court's disallowance of the deductions in this case must be affirmed.