OTIS B. MILLER AND SONYA G. MILLER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 791–74.   Filed August 29, 1977.

*D. Michael Romano* and *Steven W. Phillips,* for the petitioners.
*Richard A. Jones,* for the respondent.

WILES, *Judge:* Respondent determined deficiencies in petitioners' income taxes of $12,269.00 for 1971, and $15,075.00

for 1972. The issues we must decide are whether petitioner, Dr. Miller,[1] owned property interests in two buildings that entitle him to deductions for depreciation or amortization, and whether petitioner is entitled to interest expense deductions on mortgage notes that financed construction of the buildings.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

This case involves transactions between petitioners, Coronado Development Corp., Roberts Wesleyan College, I. J. Markin & Co., Mortgage Bankers, and Erie County Savings Bank.

Petitioners Otis B. and Sonya G. Miller are residents of Tucson, Ariz., where they filed their petition herein, and where Otis B. Miller actively practices medicine. The Millers timely filed their joint income tax returns for 1971 and 1972 with the Western Region Service Center, Ogden, Utah.

Coronado Development Corp. (hereinafter CDC), an Illinois corporation, was formed in 1966 to engage in the development of real estate ventures relating to student and dormitory housing. CDC's total capitalization as of March 1967, was $18,000 in shareholders' equity, and $39,000 in 5-percent notes payable to CDC's 12 shareholders. Shortly after its formation, CDC, through its president and principal employee, Frank Aries, started advertising and contacting small colleges around the country offering to analyze the building needs of the schools and obtain financing for construction of new buildings. As described in CDC's initial contact letter, "the key" to CDC's financing package "is based on the fact that non-profit institutions are not in a position to obtain tax concessions for depreciation, but a private investor enjoys this privilege." Although CDC contacted in excess of 2,500 small colleges, only two schools engaged CDC's services.

One school that engaged CDC was Roberts Wesleyan College (hereinafter College), a small school of approximately 600 students and 60 faculty members. College, located in

---

[1] Sonya G. Miller is a party to this action solely because she filed joint income tax returns with her husband. References hereinafter to petitioner will be to Dr. MIller.

North Chili, N. Y., was formed in 1870, is fully accredited, and is chartered by the New York Board of Regents. When first contacted by Aries, College was negotiating with a general contractor for the construction of a dormitory and an adjacent dining hall. Aries convinced College that CDC could arrange for the construction of better buildings at lower prices than the contractor, and therefore, on March 13, 1967, College entered into a letter agreement with CDC for the financing and construction of a dormitory and a dining hall. The March 13, 1967, letter agreement anticipated that College would lease land—the construction site—to CDC for a term of 35 years at an annual rental of $1 per year. College would continue to pay all real estate taxes and assessments on the property and would subordinate its interest in the land to a mortgage securing a construction and permanent financing loan. Included in the cost of constructing the buildings, later calculated at $870,000, was a 3-percent fee to CDC as compensation for its services in placing the permanent financing, and a 1-percent fee for placing the interim or short-term financing. Although the buildings to be constructed were technically to be in CDC's name, College had final approval on all specifications and drawings. It was further anticipated in the March 13, 1967, letter agreement that immediately upon the execution of the ground lease to CDC at $1 per year, CDC would lease back to College the ground as well as the buildings to be constructed thereon. This leaseback agreement was to last for 25 years with a rental of $7,000 per month for the first year, followed by a rental of $9,000 per month for the remaining 24 years. Finally, at the end of 25 years, if the ground lease and leaseback were not in default, both leases would terminate and title to the improvements on the land would automatically vest in College.

In order to finance construction of the dormitory and dining hall, CDC engaged the services of I. J. Markin & Co., Mortgage Bankers (hereinafter Markin). Markin in turn contacted Erie County Savings Bank (hereinafter Bank) and offered Bank the opportunity to make an $870,000, 25 year, 7-percent loan to be secured by the land described in the ground lease and buildings to be constructed thereon. In its prospectus describing the offered first mortgage, Markin described in detail the location, student body, and history of the College, as

well as College's financial status. Only twice in the entire presentation, however, was CDC mentioned: first, the prospectus mentioned that as additional security for the loan, a lease between CDC and College with a minimum term of 20 years at $108,000 per year would be assigned and deposited with the lending bank; second, the prospectus mentioned that title to the property would be in CDC which would execute the mortgage documents.

Before agreeing to lend money for construction of the buildings, Bank obtained appraisals on the proposed buildings and land. One appraisal, made April 1967, valued the land and proposed improvements at $200,000 and $1,130,000, respectively. The other appraisal valued the land at $65,000, and the buildings at $1,157,108. Additionally, Bank obtained a Dun & Bradstreet report on CDC. This report summarized CDC as a "New venture with success to be demonstrated. Financial details lacking." Bank also required a complete financial statement on College.

After reviewing the relevant financial statements and the proposed lease documents, Bank's outside legal counsel wrote to Markin stating that Bank would make the proposed loan under the following conditions:

> You will note that the enclosed letter of commitment on the above referenced premises from our client Erie County Savings Bank requires that Roberts Wesleyan College Corporation join in the execution and delivery of the mortgage.
>
> In examining the indenture of lease between Coronado Development Corporation and Roberts Wesleyan College Corporation dated as of June 1, 1967, it was our opinion that paragraph numbered three therein in effect makes the tenant corporation [College] a purchaser in possession with equitable title under New York law, and we therefore advised the Bank that the tenant should sign the mortgage to subordinate this interest.

One of Bank's former outside counsel and Bank's current vice president, Edward M. Zimmerman, explained at trial that the Bank's legal advisors considered this a pure fee mortgage with College's fee title encumbered by the mortgage. Since the Bank's counsel viewed College as a purchaser in possession, counsel recommended that College sign the mortgage. Zimmerman further explained that the building lease between CDC and College was an unusual lease since CDC, the landlord, did not get the leasehold estate at the end of the term; rather, the entire fee vested in the tenant.

Because of this unusual feature in the lease, it was felt that the New York State taxing authorities might deem lease payments to be mortgage payments and therefore subject to a State mortgage tax.

Zimmerman also noted that Bank viewed College, not CDC, as the ultimate source of mortgage payments. Consequently, Bank required that in case CDC defaulted in its mortgage payments, Bank could obtain the mortgage payments directly from College. For this reason Bank obtained annual financial statements only from College and not from CDC.

Bank was not the only entity that viewed College as the ultimate source of the mortgage payments. On April 8, 1967, the executive, finance, and building committees of College's board of trustees adopted the following resolution:

> RESOLVED, that we accept the proposed agreement by Mr. Frank Aries of [CDC], dated the 13th day of March, 1967, obligating the College for a sum of money up to eight hundred and seventy thousand dollars ($870,000.00), when completed and approved by our attorney, for the construction of a dormitory building and dining-hall facility * * *

As anticipated by the March 13, 1967, letter agreement, College, on June 1, 1967, leased to CDC, at an annual rental of $1 per year, the ground upon which the dormitory and dining hall were to be built.

Immediately after signing the 35-year ground lease, CDC and College entered into a leaseback agreement in which CDC leased to College the land and the buildings to be constructed. Initial rental was $7,000 per month for the first year, and $9,000 per month for the remaining 24 years of the lease. A portion of the rental was used to pay the principal and interest of the bank loan that financed construction of the buildings; three-fourths of 1 percent per year of the principal of the loan was paid to CDC in monthly installments of $543; and the remaining monthly rent was returned to College after being held for 45 days in an escrow account described as a "maintenance reserve" account.

College was required to pay all maintenance, repairs, insurance, utilities, and taxes relating to the buildings. In the event of an unforeseen casualty or condemnation, proceeds from insurance or condemnation awards were to be used to restore the buildings or repay the mortgage note. Any remaining proceeds were to go to College.

If, at the end of the 25-year leaseback term, College was not in default of the leaseback agreement, the ground lease was to terminate and legal title to the buildings was to pass directly to College without additional consideration. If College desired, however, CDC was willing to make a cash settlement of the entire lease agreement including the $543 per month payment. CDC specifically provided that College's prepayment schedule under the lease agreement was the same as CDC's prepayment schedule under the mortgage note. College at all times intended to acquire title to the buildings after the termination of the 25-year leaseback agreement. Further, College expected the useful life of the buildings to be well in excess of the 25-year leaseback.

Public records of Chili, N.Y., show that College at all times owned the land as well as the buildings constructed thereon. Construction permits for the buildings were issued in College's name.

For its first fiscal year, ending March 31, 1967, CDC had a net operating deficit of $20,721. In June 1968, CDC became a dormant, inactive corporation. Because of CDC's financial setbacks, CDC, during the latter part of 1967, began looking for a purchaser of CDC's rights under the leaseback agreements. One person contacted by Aries was petitioner, Dr. Miller. One of Aries' associates explained the leaseback to Dr. Miller as follows:

> This letter shall advise you of the cash flow you can expect from the Roberts Wesleyan College Leaseback Agreement you are about to purchase from [CDC].

*1. July 1, 1969 through February 28, 1970*

| | | |
|---|---|---|
| a. Monthly rental from leaseback............................................ | | $7,000 |
| b. Deductions: | | |
|   1. Mortgage payment to | | |
|     Erie County Savings Bank............................................... | $5,075.00 | |
|   2. Security deposit returnable | | |
|     to Roberts Wesleyan College............................................. | 1,382.00 | 6,457 |
| NET CASH FLOW PER MONTH............................................. | | 543 |

*2. March 1, 1970 through February 28, 1994*

| | | |
|---|---|---|
| a. Monthly rental from leaseback............................................ | | 9,000 |
| b. Deductions: | | |
|   1. Mortgage payment to | | |
|     Erie County Savings Bank............................................... | 6,250.25 | |

| | | |
|---|---|---|
| 2. Security deposit returnable to Roberts Wesleyan College | 2,206.75 | 8,457 |
| NET CASH FLOW PER MONTH | | 543 |

At no time did Dr. Miller visit the College property, nor did he consider an alternative use for the property. His primary interest in buying CDC's rights in the property was for the cash flow of $543 per month for the remainder of the leaseback term, approximately 23 years. For this cash flow, Dr. Miller paid CDC $49,000.

Before acquiring CDC's interest in the leaseback agreement, Dr. Miller insisted that he not be personally liable to Bank on the mortgage note. Bank allowed CDC to assign its rights, without its obligations, to Dr. Miller because Bank relied on the value of the real estate and the credit-worthiness of College to repay the mortgage note.

Although Dr. Miller acquired only CDC's rights and was never personally liable on the bank note, he reduced his income during the years in question by the amount of interest paid to Bank on the bank loan. He also reduced his income to reflect depreciation on the College buildings. The net effect of purchasing CDC's rights was that Dr. Miller received payments or cash flow from College of $543 per month during 1971 and 1972, yet, as reported on his joint income tax returns, his rights generated tax losses of $28,920 and $24,631 for 1971 and 1972, respectively.

Respondent, in his notice of deficiency, determined that as a result of claiming the interest expense deductions, depreciation deductions, and other adjustments no longer in question, petitioners had deficiencies in their income taxes for 1971 and 1972 of $12,269 and $15,075, respectively.

## OPINION

The issues we must decide are whether petitioner, Dr. Miller, owned property interests that entitled him to depreciation or amortization deductions claimed in 1971 and 1972.[2]

---

[2] On his income tax returns and in his petition, petitioner claimed he owned two buildings that were subject to a note and mortgage. He therefore argued he was entitled to depreciation deductions on the buildings and interest deductions on the note. At trial petitioner orally amended his petition, claiming in the alternative that even if he did not own the buildings he owned a lease on the buildings, the cost of which he was entitled to amortize over the term of the lease. Under his alternative

We must also decide whether petitioner may deduct interest payments made on a mortgage note that financed construction of two college buildings.[3]

Petitioner contends that CDC sold him property interests in two buildings that were subject to a mortgage. Petitioner then leased his interest in these buildings to College. As a result of the property interest he purchased in the buildings, petitioner contends he is entitled to depreciation or amortization deductions, as well as interest deductions on the mortgage to which the property interest was subject.

In contrast, respondent contends that for $49,000, Dr. Miller purchased the right to receive monthly payments of $543 for a period of approximately 23 years.[4] Respondent argues that this right entitles petitioner to amortize his $49,000 investment; it does not entitle him to any depreciation, amortization, or interest deductions that relate to the property.

The conflict between petitioner and respondent centers on the substance of a financing arrangement between College and petitioner's assignor, CDC. In form, the financing

---

argument petitioner further claims he was entitled to interest deductions on the mortgage note because the note was secured by the lease agreement. We have used the phrase "property interests" in formulating the first issue in order to encompass petitioner's two arguments that he owned either the buildings or a lease on the buildings.

[3] As a preliminary matter petitioner notes that this case centers on a question of substance versus form. The question of substance versus form, petitioner contends, was first raised as an affirmative defense in respondent's answer and therefore, respondent has the burden of proof in this case. See Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioner is in error. An affirmative defense is a matter that requires special pleading other than a mere denial, such as res judicata, collateral estoppel, etc. Rule 39, Tax Court Rules of Practice and Procedure. In contrast, a substance versus form argument is an underlying legal argument that supports a party's position on a previously raised issue. See, e.g., Court Holding Co. v. Commissioner, 2 T.C. 531 (1943), revd. 143 F.2d 823 (5th Cir. 1944), affg. Tax Court 324 U.S. 331 (1945). Respondent, in his notice of deficiency, stated that petitioner had no depreciable interest in College's buildings and further, petitioner paid no interest, was not liable on a debt for which interest was paid, and owned no property subject to a debt on which interest was paid. By doing so respondent raised issues involving depreciation deductions and interest deductions. The legal argument for disallowing these deductions, that the form of the transactions involved herein did not reflect their substance, is neither an affirmative defense requiring special pleadings nor a new matter. Consequently, the burden of proof remains on petitioners.

[4] Respondent throughout his briefs states that Dr. Miller paid $51,000 for CDC's right to the $543 monthly payment. This purchase price is in error. Joint Exhibits 61–BI and 65–BM clearly show that Dr. Miller paid $49,000 for the rights acquired.

arrangement exists as a ground lease from College to CDC, followed by a leaseback to College of the land and two buildings to be constructed thereon. CDC's rights in the lease and leaseback agreements, without the attendant obligations, were assigned to Dr. Miller for $49,000. After considering all facts and legal arguments as well as the entire record before us, we conclude that in substance, Dr. Miller, for $49,000, simply acquired CDC's right to receive a fixed fee for services rendered—$543 per month—for a period of approximately 23 years. Consequently, petitioner may amortize his $49,000 investment over its lifetime; he is not, however, entitled to depreciation or interest deductions allegedly arising from the financing agreement.

Generally, section 167[5] provides that there shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear, and tear of property held for the production of income. Section 1.167(a)–4, Income Tax Regs., provides that capital expenditures made by a lessee for the construction of buildings on leased property are recoverable through either depreciation or amortization depending on the life of the improvements and the length of time remaining on the leasehold.

As explained by the Supreme Court in *Helvering v. F. & R. Lazarus & Co.*, 308 U.S. 252, 254 (1939), affg. 101 F.2d 728 (6th Cir. 1939), affg. 32 B.T.A. 633 (1935), a deduction for exhaustion, wear, and tear is granted to a person who uses property in his trade or business and incurs a "loss resulting from depreciation of capital he has invested." "It was the design of the Congress to permit the taxpayer to recover, tax-free, the total cost to him of such capital assets; hence it recognized that this decrease in value—depreciation—was a legitimate tax deduction as business expense." *Massey Motors, Inc. v. United States*, 364 U.S. 92, 96 (1960). The critical question therefore is whether the taxpayer made a capital investment in property. If a taxpayer has no capital investment in property, he has no right to depreciation or amortization deductions with respect to the capital asset. *Fromm Laboratories, Inc. v. Commissioner*, 295 F.2d 726, 729–730 (7th Cir. 1961), affg. a Memorandum Opinion of this Court.

---

[5] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.

Involved in this case are several documents, including a ground lease from College to CDC; a leaseback agreement from CDC to College; a mortgage note between CDC and Bank; a mortgage securing the note executed by CDC, College, and Bank; and finally, an assignment of CDC's rights to petitioner, Dr. Miller. Whether these documents and formalities indicate that CDC made a capital investment that was subsequently assigned to petitioner and on which petitioner could claim amortization or depreciation deductions, must be gleaned from all documents and the surrounding circumstances. Cf. *Estate of Franklin v. Commissioner,* 64 T.C. 752, 763 (1975), affd. 544 F.2d 1045 (9th Cir. 1976). We think the entire record and circumstances indicate that College, not CDC, borrowed money and made capital investments in constructing the two college buildings. CDC, for its effort in arranging the financing of the buildings, in hiring a general contractor, and in hiring an architect, was paid a fixed fee based upon the amount of money needed to complete construction of the project. Part of this fee—alternatively described as monthly payments of $543, or annual payments of three-fourths of 1 percent of the total $870,000 borrowed—was to be paid CDC over the life of the bank mortgage. It was CDC's right to receive this fee that Dr. Miller purchased from CDC for $49,000, not the ownership or leasehold interest in two college buildings.

A variety of factors, some of which we will mention, persuade us that CDC, and hence Dr. Miller, did not make a capital investment in the lease/leaseback arrangement between CDC and College.

Initially, we note that in CDC's solicitation letter to College, Aries stated that "the key" to CDC's proposed financing package was based on the fact that nonprofit institutions cannot obtain tax benefits for depreciation whereas private investors can. Legitimately reducing taxes is, of course, the legal right of every taxpayer. *Gregory v. Helvering,* 293 U.S. 465, 467 (1935). Business arrangements, however, must be closely scrutinized to insure they "have purpose, substance, or utility apart from their anticipated tax consequences." *Goldstein v. Commissioner,* 364 F.2d 734, 740 (2d Cir. 1966), affg. 44 T.C. 284 (1965).

In a scrutiny of the leaseback, there are several factors that suggest the form of the transaction did not properly reflect its substance. CDC, which purportedly borrowed $870,000 from Bank had a capitalization of only $18,000 in shareholders' equity and $39,000 in loans from shareholders; Dun & Bradstreet reports indicate that CDC, at the time the loan was granted, was a new venture with success to be demonstrated; and CDC, during its first fiscal year ending March 31, 1967, immediately before the loan from Bank was granted, had a net operating *deficit* of $20,721. CDC's finances were so poor that by June 1968, 2 years after its inception, CDC became a dormant, inactive corporation. Given this poor financial record it would be surprising for Bank to seriously consider lending CDC $870,000.

Bank, although technically lending money to CDC, in substance realized that the construction loan was being made to College: Markin, who placed the mortgage note with Bank, clearly and completely described College in the loan prospectus; only twice was CDC mentioned. Bank required that College secure CDC's note with College's land and its interest in the prospective buildings. Bank also required annual financial statements from College but not from CDC. Bank considered College the ultimate source of mortgage payments, and therefore insured that should CDC default on the mortgage note, Bank could obtain mortgage payments directly from College by subrogating College's "lease" payments. Further, Bank was not concerned that CDC assigned its rights to Dr. Miller, since Bank relied on College's credit-worthiness, and the value of the real estate to repay the mortgage. Finally, Bank's legal counsel described College as the "purchaser in possession."

Even College viewed itself as the entity that borrowed the $870,000. By resolution dated April 8, 1967, the executive, finance, and building committees of College's board of trustees obligated "College for a sum of money up to * * * $870,000.00, * * * for the construction of a dormitory building and dining hall facility."

Other factors indicate the substance of the financing arrangement. College leased its property to CDC for a nominal $1 per year. Although the ground lease was for 35 years, it automatically ended upon the termination of the

leaseback agreement. College's prepayment privileges under the lease were identical with CDC's prepayment privileges under the mortgage. Further, at the termination of the leaseback from CDC to College, College automatically acquired title to the buildings and land with no additional payment required. CDC's interest in the buildings it ostensibly owned terminated with the lease agreement. Finally, all duties under the lease agreement to pay taxes, assessments, insurance, etc., at no time shifted away from College. Indeed, all insurance proceeds or condemnation proceeds either went into reconstructing the buildings, paying Bank's mortgage notes, or to College. Under no circumstances did any proceeds vest in CDC.

All of the above factors persuade us that the mortgage loan, used to construct the capital assets, was in substance made by Bank to College. We are therefore convinced that College, not CDC, was the entity that made the capital investment. CDC merely acted as a straw corporation, holding only the barest of legal titles.[6] Because the bank loan in substance financed College's investment in a capital asset, it is College, not CDC, that was suffering a loss through "exhaustion, wear and tear" of its capital asset. Since CDC did not make any capital investment, Dr. Miller, who acquired CDC's rights is not entitled to any depreciation or amortization deductions for wear and tear or exhaustion of a capital asset. Further, since in substance the bank loan was made to College, and in substance College, not CDC or Dr. Miller, made all interest payments, petitioner is not entitled to any interest deductions for interest paid on the loan. In sum, CDC, and hence Dr. Miller, acted merely as a conduit between College and Bank. Acting as a conduit does not entitle petitioner or CDC to deductions for depreciation or amortization nor does it entitle petitioner or CDC to deductions for interest.

---

[6] There is even some question whether CDC had legal title under New York law. Bank's counsel clearly believe that New York State taxing authorities would consider Bank's loan a mortgage loan to College thereby subjecting College to a State mortgage tax. For purposes of this opinion, however, it is not necessary for us to determine who, under New York law, owned the two buildings. Our duty is merely to determine, for tax purposes, who made the capital investments that are subject to depreciation.

To reflect the foregoing,

*Decision will be entered under Rule 155.*