ROBERT R. HEDRICK, JR., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hedrick v. Commissioner
Docket No. 11167-76.
United States Tax Court
T.C. Memo 1980-54; 1980 Tax Ct. Memo LEXIS 535; 39 T.C.M. (CCH) 1111; T.C.M. (RIA) 80054; February 27, 1980, Filed *535 Held: Respondent's reconstruction of income using the bank deposits method upheld with minor adjustment. Heldfurther: Petitioner's transfer of a deed was made to secure a loan rather than as a sale of the property. Heldfurther: Petitioner received constructive dividends as a result of payments made by his wholly-owned corporation in discharge of his wife's debts. Heldfurther: Petitioner received constructive dividends rather than loan repayments from the sale of assets of his wholly-owned corporation. Heldfurther: Petitioner received a dividend upon the distribution of $1,360 in 1970 from a subsidiary of his wholly-owned corporation rather than a loan repayment. Heldfurther: Petitioner received payment for rights in lease rather than as a loan repayment. Heldfurther: Additions to tax upheld. Arthur P. Tranakos, for the petitioner. Albert L. Sandlin, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies in petitioner's Federal income tax and additions thereto pursuant to section 6651(a)(1)[1] *536 and 6653(a) as follows: Year
Deficiency
Sec. 6651(a)(1)
Sec. 6653(a)
1969
$ 428.79,h$ 107.20
$ 32.19
1970
2,667.61
660.90
133.38
1971
10,077.60
2,519.40
511.28
The issues presented for our consideration are: (1) whether petitioner received unreported income as determined by respondent's reconstruction of income; (2) whether petitioner had unreported capital gains in 1969 from the sale of rental property; (3) whether petitioner received constructive dividends in 1969 as the result of payments made by his wholly-owned corporation in discharge of his wife's debts to various creditors; (4) whether petitioner received constructive dividends in 1970 and 1971 from the sale of the assets of his wholly-owned corporation; (5) whether petitioner received a constructive dividend in 1970 upon the distribution of $1,360 from a subsidiary of his wholly-owned corporation; (6) whether petitioner received a constructive dividend in 1970 upon the assignment of a lease from the subsidiary of his wholly-owned corporation to another corporation; and (7) whether petitioner is liable for additions to tax for failure to timely file returns and for negligence in the underpayment of taxes. FINDINGS OF FACT Some of the facts have been *537 stipulated. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Petitioner filed delinquent income tax returns, using the married-filing-separate status, for the taxable years 1969, 1970, and 1971 with the District Director, Internal Revenue Service, Atlanta, Georgia. The return for the year 1969 was filed on May 11, 1972, and the returns for the years 1970 and 1971 were filed on January 11, 1973. Petitioner resided in Atlanta, Georgia at the time he filed his petitioner herein. Petitioner applied for extensions of time to file his return for 1971 on April 17, 1972 (until June 15, 1972), June 15, 1972 (until July 15, 1972), July 14, 1972 (until August 15, 1972), August 15, 1972 (until September 15, 1972), September 15, 1972 (until October 15, 1972,, and October 15, 1972 (until November 15, 1972). The requests stated that an extension was needed because the records of a corporation in which he was a 100 percent shareholder were lost in 1971 and that time was needed to reconstruct the records so that items affecting his personal return could be determined. Petitioner was granted an extension to file until August 15, *538 1972. During each of the years in issue, petitioner was the sole shareholder of Domino, Inc.Domino was incorporated in Fulton County in 1960 and was engaged in the business of operating Domino Lounge, a nightclub in Atlanta. Petitioner was president and his wife, Leatrice, was secretary. Domino had two wholly-owned subsidiaries, Tip-Top, Inc. and Empire Properties, Inc.Empire Properties' primary business was subleasing building and equipment to nightclub proprietors. Domino and its two subsidiaries filed consolidated corporate income tax returns for the fiscal years ending August 31, 1969 and August 31, 1970 with the District Director, Internal Revenue Service, Atlanta, Georgia. The returns were prepared by Bach, James and Company, a C.P.A. firm in Atlanta. The 1970 return was designated the "final return". Both returns were dated January 9, 1973, and attached to each return was an "Affidavit to Accompany Late Filing of a Return". [2] *539 Unreported Income-Bank Deposits
In 1969 petitioner reported a salary of $2,600 from Tip-Top, Inc., and rental income from property *540 located on Skyland Trail of $1,100, offset by $784.17 for depreciation and $937.31 for interest, taxes, and insurance, thereby yielding a net operating loss of $621.48. In 1970, petitioner's only reported income was wages of $1,700 designated as "Henry Kyle Negotiation Fee." This amount was deposited into petitioner's wife's account on June 16, 1970. In 1971, petitioner reported salary of $2,150 from Court Ford, Inc., and a long-term capital gain of $4,239, resulting from the sale of "Big Shanty Shopping Cent." Petitioner maintained a checking account at the Peoples American Bank in Atlanta. From the period February 3, 1969 through December 31, 1970, however, there was virtually no activity in this account. Petitioner was married to Leatrice L. Hedrick during the years in issue. Leatrice was neither gainfully employed during 1970 and 1971 nor otherwise engaged in any money-making activities. [3] *541 Leatrice was employed by Domino, Inc. during 1969 and drew a salary. She filed a separate Federal income tax return for 1969. During the years 1970 and 1971, petitioner's wife maintained a checking account in the name of "Mrs. Robert R. Hedrick, Jr." at the National Bank of Georgia. Total deposits to the account were $29,795.96 in 1970 and $19,231.26 in 1971. In the notice of deficiency, respondent determined that petitioner received unreported income based on deposits to this account in the amounts of $3,874.21 and $3,516.25 for 1970 and 1971, respectively. [4]
*542 Capital Gain - Skyland Trial Property - 1969
On August 19, 1955, petitioner purchased by warranty deed real estate which he used as rental property, located at 2442 Skyland Trial in DeKalb County, Georgia. At the same time, petitioner executed a security deed on the property in the amount of $15,550 to D. L. Stokes & Company, Inc., providing for monthly payments of $78.81 commencing September 1, 1955 and terminating August 1, 1985. Both of these deeds were recorded on August 25, 1955. On January 4, 1964, petitioner sold the property by warranty deed to Paul Goecke, subject to the D. L. Stokes & Company, Inc. mortgage. At the time of the sale there was principal remaining due of $13,068.58. The deed to Goecke was never recorded. The remainder of the purchase price ($8,000) was secured by an unrecorded "deed to secure debt." Petitioner assigned this deed to Ernest D. Brookins. At some point in 1965 or 1966, petitioner apparently reacquired the property after Goecke stopped making payments on the mortgage. Petitioner made the mortgage payments to D. L. Stokes & Company after reacquiring the property, although he had not received a deed from Goecke. On May 9, 1969, petitioner borrowed *543 $10,000 from Henry Kyle. On November 12, 1969, Geocke transferred a quit claim deed for the Skyland Trail property to Kyle, which was recorded on July 2, 1970. On one of D. L. Stokes & Company's mortgage ledger sheets, Goecke's name is crossed out and Kyle's name is typed in. The date - November 12, 1969 - appears beside Kyle's name. Nonetheless, petitioner's wife continued to make the mortgage payments to D. L. Stokes & Company through September or October 1972, after which Kyle made the payments. In addition, petitioner received notices regarding the Stokes' loan and also received the 1971 year-end statement addressed to Goecke in care of petitioner at his home. Petitioner deducted rental expenses and depreciation attributable to the property in 1969 but not in 1970 or 1971. On November 15, 1974, Kyle transferred by quit claim deed his interest (if any) in the property to Paula Holtzclaw. This deed was recorded on December 16, 1974. On June 30, 1975, petitioner executed a quit claim deed on the property to Holtzclaw which was recorded on August 14, 1975. When petitioner sold the property to Kyle (in either 1973, as petitioner contends, or on November 12, 1969, as respondent *544 contends), his $10,000 debt to Kyle was discharged as part consideration for the sale.
In the notice of deficiency, respondent determined that petitioner realized capital gain in 1969 of $10,238.35 on the transfer of the property, computed as follows: Sales price of property: Mortgage assumed
$10,649.26 [5]
Loan cancelled by Kyle
10,000.00
Amount realized
$20,649.26
Less Basis: Cost of land, building
$17,525.00
and furniture
Less: Accumulated depreciation
( 7,114.09)
(10,410.91)
$10,238.35
Constructive Dividends - Car, Pool and Mortgage Payments - 1969
During 1969, Domino made payments on the D. L. Stokes & Company mortgage on the Skyland Trial property. Respondent determined that these payments by Domino, constituted a dividend to petitioner to the extent of $186. [6]
In approximately 1964, a swimming pool was constructed at petitioner's and his wife's residence. Petitioner's wife was obligated to make payments with respect to the pool to Alcoe Credit Union *545 (hereafter Alcoe) in 1969. Domino made these payments in 1969 to Alcoe. Respondent determined that $536.25 of these payments were dividends to petitioner. [7]
In about April 1969, petitioner's wife purchased a 1969 Cadillac. The purchase was financed by General Motors Acceptance Corporation (GMAC) and petitioner's wife was obligated to make payments on the note. Domino made payments in 1969 on this note. Respondent determined that $346.62 of the payments made by Domino on this note in 1969 constituted dividends to petitioner. [8]
Petitioner's wife reported as income from salary and wages $12,750 earned from Domino in 1969. Constructive Dividends - Payments Received in 1970 and 1971 from Johnny Kirk on the Sale of the Domino Lounge.
On February 1, 1966, Ebb, Inc. (lessor) executed a lease of space in the Imperial Hotel to Domino (lessee) in which the Domino Lounge was to be situated. The lease provided for payments of $1,000 per month until May 1, 1969 but was not to terminate until April 30, 1974. On October 15, 1969, petitioner, as president of Domino subleased the property to 355 Peachtree Corporation[9] (lessee). The sublease provided for payments *546 of $1,200 per month through December 31, 1974. The lease agreement was signed by Guerry Moore as president of 355 Peachtree. In November 1969, an unsigned agreement provided for the assignment of Domino's lease with Ebb, Inc. to Johnny Kirk for a total consideration of $1. Kirk thereafter made the rental payments due under the lease to Ebb, Inc. Apparently, no amount was paid by Kirk to Domino (or petitioner) under this November assignment. In July 1970, petitioner and Kirk entered into another agreement whereby Kirk was to pay petitioner $250 per week (in addition to making the rental payments to Ebb, Inc.) on an option to purchase the Domino Lounge. Respondent determined that these payments totaled $4,230 in 1970 and $4,500 in 1971 and constituted dividends to petitioner. In July 1971, Domino entered into an agreement with Kirk whereby Kirk purchased all the assets of the Domino Lounge. Petitioner reported a gain on the sale as follows: Cash
$25,750
Payable Assumed
58,545
Total
84,295
Less: Basis
11,303
Gain
72,992
There was no written or *547 formal agreement with respect to the sale, however, except for the previous unsigned assignment of the lease. As part consideration for the sale, Kirk paid petitioner $20,000 on May 21, 1971. Respondent determined that the $20,000 constituted a dividend to petitioner. Milton Bach, a certified public accountant, of Bach, James and Company, prepared both petitioner's individual income tax returns and Domino's corporate income tax returns. Bach also performed bookeeping services for Domino. Bach did not audit Domino but in reconstructing its income for the years in issue after Domino's books were lost, he used lists from talent agencies to determine what talent was booked into Domino, copies of talent contracts, and reports of the State Sales Tax Department. Other expenses were only estimates of average monthly bills. Prior to 1969, Bach used daily and weekly cash receipt reports, canceled checks, paid bills, and bank statements to prepare the books. Some information, however, was provided by petitioner simply telling Bach what entries to make without any additional verification. Petitioner attached a schedule "Income Tax Information" to his 1970 tax return, stating in part that *548 "During the year 1970, taxpayer received $6,000 as repayment of loans made to Domino, Inc. and subsidiaries." A similar schedule was attached to his 1971 return indicating that petitioner received $19,500 as loan repayments from Domino and subsidiaries. The balance sheets on the consolidated income tax returns for Domino's fiscal years ending August 31, 1969 and August 31, 1970, show the following information with respect to advances by officers and shareholders: FYE 8-31-69
Beginning of year (9-1-68)
Empire
Tip Top
Properties
Domino
Inc.
Inc.
Eliminations
Total
Domino
Loand Stockholders
$74,200
$74,200
Loans Officers
($6,844)
17,913
$21,080
8,250
$23,899
$2,627
FYE 8-31-70
Beginning of year (9- 1-69)
Loans Shareholders
66,368
66,368
Loans Officers
2,627
11,475
20,091
34,193
877
The worksheets prepared by Bach provides the following
information: [10]
End of Year (8-31-69)
Empire
Tip Top
Properties
Inc.
Inc.
Eliminations
Total
Loans Stockholders
$66,368
$66,368
Loans Officers
11,475
$20,091
$34,193
End of Year (8-31-70)
Loans Shareholders
66,368
66,368
Loans Officers
14,325
20,091
35,293
Adjusted Trial
Transactions
8-31-68
Domino
Dr
Cr
Dr
Cr
Loans-Officers
$6,844.33
$9,470.83
Adjusted Trial
Transactions
8-31-69
Domino Inc.
Dr
Cr
Dr
Cr
Loans-Officer
$2,626.60
$1,750.00
Balance
Transactions
9-1-68
Empire
Dr
Cr
Dr
Cr
Loans-Officer
$21,080.65
989.29
Balance
Transactions
9-1-68
Tip Top Inc.
Dr
Cr
Dr
Cr
Loan-Shareholders
$74,199.92
Loan-Officers
17,912.95
$2,513.23
Balance
Transactions
9-1-69
Tip Top Inc.
Dr
Cr
Dr
Cr
Loan-Shareholder
$66,368.08
Loan-Officers
11,474.69
2,850.00
Adjusted Trial
8-31-69
Domino
Dr
Cr
Loans-Officers
$2,626.60
Adjusted Trial
8-31-70
Domino Inc.
Dr
Cr
Loans-Officers
876.60
Balance
8-31-69
Empire
Dr
Cr
Loans-Officer
$20,091.36
Adjustments
Tip Top Inc.
Dr
Cr
Loan-Shareholders
$7,831.84
Loan-Officers
8,250.00
701.48
Balance
(12-31-69)
Tip Top Inc.
Dr
Cr
Loan-Shareholder
$66,368.08
Loan-Officers
14,324.69
*549 Domino
Loans-Officers
Transactions
Balance
FYE 8-31-71
Domino Inc.
Dr
Cr
Dr
Cr
Loans-Officers
$24,000.00
$2,737.80
$22,385.60
Empire
Loans-Officer
Balance
9-1-69
Tip Top Inc.
Dr
Cr
Loan-Shareholders
$66,368.08
Loan-Officers
11,474.69
Tip Top Inc.
Loan-Shareholder
Loan-Officers
Constructive Dividend Distribution from Empire Properties, Inc. - 1970
Petitioner received a distribution from Empire Properties, Inc., in the amount of $1,360 in 1970. The amount of $1,360 was deposited into petitioner's wife's checking account. Respondent determined that the $1,360 distribution constituted a dividend to petitioner. Constructive Dividend - 1970 Payments from H & S Sales, Inc.
Empire properties, Inc., was originally incorporated to buy property with respect to which petitioner had an option to purchase. Petitioner did not buy the property, and on October 15, 1966, Empire Properties, Inc. (lessee) leased the property from Charles and Florence Rinzler (lossors). On January 2, 1967, Empire Properties subleased the property to Tip-Top for use as a parking lot at night. Tip-Top originally did business as a nightclub but ceased operating the club in 1967. Between 1967 and 1969, Tip-Top leased the property to FHT Corporation *550 which operated a nightclub called "The Scene." Petitioner and Tip-Top each had, approximately, a 48 percent interest in FHT. On May 23, 1967, Empire Properties entered into another sublease of the property to Lenox Plaza, a hospital, for use during the day. In 1969 the City of Atlanta closed down the "The Scene" and due to the loss of rental income, Empire Properties could no longer meet its obligations on the lease. Rinzler then canceled the lease. No record of this cancellation was ever made. On March 1, 1970, Ponce de Leon Stores (lessor), which was owned by Rinzler, entered into a lease of the property with H & S Sales (lessee) calling for monthly rental of $1,750 to commence on April 1, 1970 and end on March 31, 1973. On May 29, 1970, Empire Properties, by an instrument entitled Assignment of Lease," assigned its lease with Rinzler (and the Lenox Plaza sublease) to H & S Sales. H & S Sales continued the Lenox Plaza sublease. On June 1, 1970, petitioner received a check in the amount of $6,000 from H & S Sales signed by its corporate officer and shareholder, Julius Silverman. The check was then endorsed by petitioner to his wife and $4,500 of the $6,000 was deposited to her *551 account on June 3, 1970. H & S had no assets other than the lease, and Silverman later decided to sell H & S because it was losing money. Petitioner paid Silverman $6,000 on February 1, 1971, for the purchase of H & S. On its corporate income tax return for the fiscal year ending February 28, 1972, H & S Sales reported the amortization of a lease with a cost of $6,000 and a life if 24 months. Prior year's amortization was reported as $2,000; current year's amortization was $3,000. Respondent determined that the $6,000 received by petitioner from H & S Sales on June 1, 1970, represented a payment for the lease held by Empire Properties and, thus, a constructive dividend from Empire Properties to petitioner. ULTIMATE FINDINGS OF FACT 1. Petitioner received unreported income in the amount of $3,374.21 in 1970 and $3,516.25 in 1971. 2. Petitioner did not transfer his beneficial interest in the Skyland Trail property to Kyle in 1969. 3. Payments made by Domino for the benefit of petitioner's wife did not represent salary to her, but constituted constructive dividends to petitioner. 4. Payments received by petitioner from Johnny Kirk were not repayments of loans by Domino, but *552 represented constructive dividends from Domino to petitioner. 5. The $1,360 received by petitioner from Empire Properties in 1970 was not a repayment of a loan but constituted a constructive dividend to petitioner. 6. The $6,000 received by petitioner from H & S Sales in 1970 was not a loan but constituted consideration paid by H & S for a lease held by Empire Properties. 7. Petitioner's underpayment of tax was due to negligence or intentional disregard of rules and regulations. OPINION Unreported Bank Deposits
Petitioner makes no objections to respondent's use of the bank deposits method to reconstruct his income, but maintains that he has accounted for all the deposits as having been derived from nontaxable sources. Petitioner also contends that since he and his wife filed separate returns any unaccounted for deposits to her account must be deemed his wife's income. Since petitioner's wife was not employed or engaged in any money-making activities in 1970 and 1971, and it appears that petitioner and his wife did not keep their finances separate, we believe respondent correctly attributed unexplained deposits to petitioner's wife's account as amounts which must have been *553 given her by petitioner and, therefore, as income to petitioner. Petitioner himself testified that he was not using a bank account and that he deposited money he received from various sources into his wife's account. Petitioner claims, however, that the following amounts should reduce the unexplained deposits as determined by respondent (in addition to the reductions actually allowed by respondent): $1,700 fee earned from Henry Kyle; $6,000 from H & S Sales, as opposed to the $4,500 respondent allowed; and $5,680 from the Domino Lounge, rather than the $4,230 respondent allowed. [11] *554 In making his recomputation to determine the amount of unexplained deposits for 1970, respondent first totaled the deposits made to the account. Included in this amount for 1970 was the $1,700 petitioner received from Kyle. Respondent then subtracted from this amount all identifiable deposits, but did not at this point subtract the $1,700. Respondent then adjusted this net amount by adding to it $500 as a "1970 Deposit in transit" [12] and subtracting from it $1,700 as "Receipts, per return." As can be seen, therefore, respondent did, in fact, reduce unexplained deposits by the $1,700 fee. Petitioner testified that payments he received *555 from Kirk for the option on the Domino Lounge totaled $5,680 in 1970 (and constituted repayment of a loan he had previously made to Domino), rather than the $4,230 respondent determined. Petitioner contends that Kirk made the full amount of payments due during the year and that these amounts were deposited in the account. The list of deposits made to the account from July 1970 (the month during which the option payments commenced) does not support petitioner's testimony. Deposits made into the account from July 1 through December 30, excluding the $500 shown as "in transit" on December 30, the $4,500 July 16 deposit and the $5,000 September 18 deposit, total only $4,706.14 [13] *556 , of which respondent determined $4,230 was attributable to payments from Kirk. We hold for respondent as to this item. Similarly, petitioner contends that he received $6,000 in 1970 as a loan from H & S Sales which was deposited into the account, instead of the $4,500 respondent determined. Petitioner received $6,000 from H & S Sales on June 1, 1970 and $4,500 of this was deposited into the account on June 3. The only additional credit to the account in June was the $1,700 deposit of the Henry Kyle fee. As we noted previously, only $4,706.14 was deposited into the account after July (excluding the three specific transactions noted previously) and of this amount, respondent determined that $4,230 were payments from Kirk, a result with which petitioner not only agrees but argues is understated. Thus, there is no evidence to support petitioner's contention that the additional $1,500 from the H & S Sales transaction was deposited in his wife's account, and we again hold for respondent on this disputed amount. Petitioner's argument with respect to 1971 is based upon his list showing unexplained deposites of $316.25. [14] From the premise that there is only a $316.25 error, petitioner contends *557 first that such an amount is de minimis and should not be included in income and second, that payments from the $24,500 received in connection with the option and sale of Domino Lounge could in any event explain the remaining $316.25. Unfortunately for petitioner, there is a mathematical error in his computations and the unexplained deposits actually total $4,316.25. Adjusting for this error, we cannot say that the amount of unexplained income is de minimis, nor do we believe that petitioner has shown that any deposits are attributable to receipts from the sale of the Domino Lounge (in amounts in excess of that attributed by respondent). Therefore, we hold for respondent on this issue. *558 Capital Gain - Skyland Trail Property - 1969
Respondent determined that petitioner realized a long-term capital gain of $10,238.35 in 1969 from the sale of the skyland Trail property. Petitioner disputes respondent's determination of the year of sale, the sales price, and his basis in the property.
Petitioner acquired the Skyland Trail property on August 19, 1955 by warranty deed and executed a security deed to D. L. Stokes & Company at the same time. Both deeds were recorded. On January 4, 1964, petitioner transferred the property subject to the security deed to Paul Goecke. At some point in 1965 or 1966, petitioner reacquired the property after Goecke stopped making payments on the mortgage. Petitioner thereafter made the mortgage payments due to D. L. Stokes & Company, but never received a deed for the property from Goecke. On November 12, 1969, Goecke transferred the property to Kyle by quit-claim deed which was recorded on July 2, 1970.Kyle, on November 15, 1974, then transferred his interest in the property to Paula Holtzclaw. On June 30, 1975, petitioner executed a quit-claim deed on the property to Holtzclaw which was recorded. Respondent contends that petitioner effected *559 a sale of the property to Kyle on November 12, 1969.Petitioner maintains that this transfer was only to secure the $10,000 loan Kyle had previously made to him on May 9, 1969 and that no sale occurred until 1973 at which time petitioner contends Kyle cancelled the debt and assumed the mortgage payments. This issue is difficult because of the confusing record in relation to the deeds. Respondent argues that the deed to Kyle does not mention that it is a security interest; that the D. L. Stokes & Company mortgage ledger bears a notation beside Kyle's name November 12, 1969; that petitioner deducted rental expenses in 1969 but not in 1970 or 1971; and petitioner was paid $1,700 by Kyle in 1970 although, if petitioner was correct in stating that the property was not transferred until 1973, he still owed $10,000 to Kyle at the time Kyle paid him. Petitioner points to the payments made by his wife on the Stokes mortgage subsequent to 1969 and the fact that he took depreciation for all of 1969 to support his testimony on this issue. On balance, weighing petitioner's credibility in his testimony on this point, we hold for petitioner on this issue. Constructive Dividends - Car, Pool *560 and Car Payments - 1969
The law is well settled that if a corporation pays an obligation of its stockholder or makes a payment for his benefit, the payment may constitute a taxable dividend to the stockholder. See Smith v. Commissioner, 70 T.C. 651, 668 (1978); Sachs v. Commissioner, 32 T.C. 815, 820 (1959), affd. 277 F.2d 879, 882 (8th Cir. 1960), cert. den. 364 U.S. 833 (1960). Petitioner contends that the payments made by Domino in discharge of his wife's legal obligations on the GMAC loan on her car, on the loan from Alcoe Credit Union with respect to the swimming pool built at their residence in 1964 and on the Skyland Trail mortgage on which petitioner was personally liable, did not inure to his benefit. Rather, he contends that such payments were part of his wife's $12,750 salary from Domino (which she reported on her income tax return). Petitioner testified that during 1969 Domino had financial problems and often could not meet Leatrice's $250 weekly salary.Therefore, in order to pay her some of her salary, Domino would pay the various notes as they came due. Petitioner has failed to introduce any other evidence into the record in support of his argument other than his *561 own self-serving testimony.[15] On the record before us, we hold that petitioner's testimony is not sufficiently credible to meet his burden of proof.
Constructive Dividends - Payments Received in 1970 and 1971 from Johnny Kirk on the Sale of the Domino Lounge
There is no dispute that the amounts paid by Kirk to petitioner under the July 1970 option and the 1971 purchase of the Domino Lounge represent constructive payments to petitioner by Domino, Inc. The contract of sale of the Domino Lounge and the option to purchase, although nominally made by petitioner, must have been made in a representative capacity for Domino, since it was one of Domino's assets (the Domino Lounge) that was being sold. Petitioner contends that these payments represented the repayment of loans he had previously made to Domino, and for that reason do not constitute dividends. *562 Petitioner relies on the corporate returns and the accountant's workpapers to establish the amount of loans he made to Domino and its subsidiaries and that the loans were repaid by the payments here in issue. Respondent first contends that the worksheets and income tax returns are unreliable and do not prove that petitioner advanced these amounts to Domino and its subsidiaries. We agree with respondent. Initially, we note that at least some of theentries made on the worksheets were based on what petitioner told Bach without any verification made by Bach. Petitioner's tax returns and worksheets purportedly establish that there were large loans by petitioner to Domino outstanding as of August 31, 1970. Only one of the worksheets shows transactions that occurred after August 31, 1970 (the period in which all but possibly $1,000 of the payments in issue were made). [16] That worksheet shows a debit of $24,000 and a credit of $2,737.80 to Domino's officer loan account. But the adjusted balance shown on the worksheet (and tax return) as of August 31, 1970 shows a credit balance of only $876.60 (or $877). The balance as of August 31, 1971 shows a debit in the account of $22,385.60. *563 Therefore, while the worksheet shows an advance by Domino of $24,000 to petitioner it also shows that at the time of the advance Domino owed petitioner only $876.60. After the advance by Domino to petitioner (and an advance of $2,737.80 by petitioner to Domino), the worksheet shows that as of August 31, 1971, petitioner owed Domino $22,385.60. We simply fail to see how this establishes that Domino (or its subsidiaries) [17] *564 repaid any loans. Nor do the statements attached to petitioner's returns stating that he received $19,750 as a loan repayment in 1971 and $6,000 in 1970 establish that he received these amounts [18] as repayments of loans. Watab Paper Co. v. Commissioner, 27 B.T.A. 488, 506 (1932); Goodman v. Commissioner, a Memorandum Opinion of this Court dated December 18, 1946, affd. sub. nom. Heyman v. Commissioner, 176 F.2d 389 (2d Cir. 1949), cert. den. 338 U.S. 904 (1949). Moreover, no notes or other evidence of the alleged loans and repayments were introduced into evidence. Based upon this record, we do not believe petitioner has shown that the payments by Kirk represent loan repayments. [19] *565 Constructive Dividend from Empire Properties, Inc. - 1970
Petitioner does not dispute that the $1,360 distribution from Empire Properties inured to his benefit but, again, contends that such an amount represents the repayment of a loan. For the reasons noted in our opinion on the previous issue, we hold for respondent. The tax returns show loans by officers to Empire Properties of $20,091 as of August 31, 1969 and August 31, 1970. Through August 31, 1970, no amount is shown as repaid nor is there any record of transactions occurring between September 1, 1970 and December 31, 1970. Constructive Dividend - 1970 Payments from H & S Sales, Inc. Petitioner does not dispute that he received $6,000 from Julius Silverman in 1970 but contends this was a loan rather than payment from H & S Sales to Empire Properties for its rights in the lease. Petitioner *566 maintains that the assignment of the lease on May 29, 1970 was only to clear the status of the lease between Ponce de Leon and H & S Sales entered into on March 1, 1970. Since Rinzler had cancelled the lease with Empire pRoperties in 1969, petitioner contends that Empire Properties no longer had any rights in the lease and its assignment could not have been for consideration; therefore, the payment by Silverman must have been a loan. Respondent first disputes the fact that Rinzler cancelled the lease with Empire Properties, but we have found as a fact that this was case, although no record of the cancellation was made. Respondent next points to the amortization reported on H & S's return for its fiscal year ending February 29, 1972 of $6,000 over 24-months; $2,000 of the $6,000 had been amortized prior to its 1972 fiscal year and $3,000 was amortized during the March 1, 1971-February 29, 1972 fiscal year. Since the lease was amortized at $250 per month ($6,000 / 24-months) this means that the lease had been amortized by H & S commencing July 1970. Of course, a lease cannot be amortized unless it is purchased and the inference is clear that Silverman, signing the check as H & S's *567 representative, amortized the purchase cost of the least (H & S's only asset). If the lease was still in Empire Properties' name, as it appeared to be, and the rights under the lease (including the sublease to Lenox Plaza) were clouded, as petitioner concedes, it does not follow that there was no consideration for the assignment of the lease. As noted before, Silverman obviously thought he was purchasing the lease. Moreover, the $6,000 check was given to petitioner just two days after the assignment. No note or other evidence was introduced into the record to show that the $6,000 was a loan. There is no testimony that Silverman was a friend of petitioner or would make a $6,000 unsecured loan not evidenced by a note and without interest. Petitioner next contends that the lease was worthless when he paid Silverman $6,000 in February 1971 to purchase H & S. Since, argues petitioner, H & S was worthless, he obviously would not pay any amount for it and this is evidence that the $6,000 was a repayment of a loan. We do not believe H & S was worthless. The sublease to Lenox Plaza was for the daytime only and if petitioner could lease the lot at night it would presumably turn a profit. *568 That petitioner would take over a corporation whose only asset was a lease, knowing that the corporation's rent payments would always exceed its receipts, is difficult to believe and is unexplained except for some testimony that "it meant something to me." We hold that the $6,000 was payment for the lease. Petitioner argues in the alternative that thepayment should be considered a repayment by Empire Properties of amounts he previously loans to it and not a dividend. For the reasons we stated before in holding that the $1,360 distribution from Empire Properties constituted a constructive dividend, we reject this argument. Additions to Tax - Sections 6651 (a) (1) and 6653 (2)
Petitioner has not addressed these issues on brief, apparently relying only on his efforts to show that there was no deficiency. Although petitioner testified that he filed a delinquent return for 1969 because 1969 was a "messed up year" and attached a statement to his requests for extensions of time stating that the records of a corporation in which he was a 100 percent shareholder were lost in 1971, this is insufficient to meet his burden of proof on these issues. No adequate explanation was forthcoming *569 by petitioner for his failure to maintain or provide respondent with adequate records. Accordingly, we sustain the additions to tax as determined by respondent. Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the taxable years in issue.
2. The affidavit states: * * *
During the fiscal year ended August 31, 1969, and the subsequent period ended December 31, 1970, I presented my accountants Bach, James & Company, Atlanta, Georgia, with accounting data relative to the operations of the Domino, Inc., Tip Top, Inc., and Empire Properties, Inc.
These records consisted of bank statements with canceled checks, paid invoices, daily and weekly cash reports, payroll reports and other related accounts. Because of the inability to pay the accountants for their services, they prepared only the payroll tax returns during this period. They later returned all of this information together with general ledgers and their work paper files to me. There records were inadvertently thrown out by the cleaning people and were destroyed by fire. I have now re-engaged Bach, James & Company who have prepared the above returns from such information as available, and using such reasonable estimates as are necessary in the substance of any documentation. I respectfully submit that these returns have been prepared from the best information available and that the estimates are based on what I believe to be reasonable amounts, and that there has been no intent to defraud either by failure to file or by inadvertently making an error in the above information.↩
3. Both parties have stipulated to this fact. However, respondent in reconstructing petitioner's income for 1971 gave credit to petitioner for $625 as "Mrs. Hedrick's salary" as a reduction in his income. See footnote 4, infra. No explanation for this inconsistency appears in the record.
4. 1970
Total Deposits - National Bank of Georgia
$29,795.86
Less: Income Tax Refund of Mrs Hedrick
$ 793.11
Transfers from children's
savings account
1,238.54
Proceeds from loans from
China Hedrick
$2,000.00
Jean Long
1,000.00
R. R. Hedrick, Sr.
4,500.00
Lincoln National Life
5,000.00
12,500.00
Check cashed for friend
100.00
Amounts taxable as dividends
Payment from H & S Sales
$4,500.00
Payment from Johnny Kirk,
Sale of Domino Lounge 4,230.00
Advance from Empire
Properties
1,360.00
10,090.00
24,721.65
Balance
$ 5,074.21
Add: 1970 Deposit in transit
500.00
Total Receipts
$ 5,574.21
Receipts, per return
1,700.00
Unexplained Deposits
$ 3,874.21
1971
↩
Total Deposits - National Bank of Georgia
$19,231.26
Less: Returned Checks - not redeposited
$3,782.50
Georgia Power refund
469.24
Rebate - I. T. Cohen
900.00
Insurance claim - North American
350.00
Insurance claim - Employee's Commercial
1,000.00
Reimbursement for H & S trip
280.00
Insurance claim - Aetna
808.27
Rebate for funds paid out - Jack Gammage
500.00
Loan proceeds - National Bank of Georgia
2,500.00
Mrs. Hedrick's salary
625.00
Payment from Johnny Kirk -
taxable as a dividend
4,500.00
15,715.01
Unexplained Deposits
$ 3,516.25
5. This amount represents the principal amount remaining due on the mortgage with D. L. Stokes & Company as of December 6, 1969.↩
6. This represented the portion of the payments with respect to which earnings and profits were available to pay dividends.↩
7. See footnote 6.↩
8. See footnote 6.↩
9. Petitioner had a 50 percent beneficial interest in 355 Peachtree Corporation, however, the stock was listed in the names of two of his employees.↩
10. Credits represent advances from shareholders; debits represent advances to the shareholders.↩
11. On brief petitioner computes unexplained deposits of $1,924.31 for 1970 as follows: TOTAL DEPOSITS
$29,795.96
(1) From Children's Savings
(1,238.54)
(2) Loan from China Hedrick
(2,000.00)
(3) Cashed check for Friend
(100.00)
(4) Loan Repayment from Empire Properties, Inc.
(1,360.00)
(5) Federal Income Tax Refund
(793.11)
(6) Loan from Jean Long
(1,000.00)
(7) H & S Sales
(4,500.00)
(8) Henry Kyle
(1,700.00)
(9) Loan from Robt. Hedrick
(4,500.00)
(10) Lincoln National Life Insurance Co.
(5,000.00)
(11) The Domino, Inc.
(5,680.00)
Unexplained Deposits
$1,924.31 From this amount, he then subtracts an additional $1,500, which he contends is attributable to h & s s/ales.
12. The $500 addition by respondent appears to be in error. The schedule of deposits for 1970 to the National Bank of Georgia account shows, on December 30, $500 listed as "in transit." This amount was then added to the deposits made to the account to determine the $29,795.96 total deposits. This $500 previously added to the deposits made to the National Bank of George is the same $500 respondent added as an adjustment to the 1970 deposits to arrive at total unexplained deposits. This leads to a double inclusion.↩
13. July 16
$4,500.00
July 22
275.00
July 31
250.00
Aug. 3
250.00
Aug. 20
250.00
Aug. 21
250.00
Sept. 4
230.00
Sept. 16
251.14
Sept. 18
5,000.00
Sept. 22
200.00
Sept. 29
250.00
Oct. 8
200.00
Oct. 16
250.00
Oct. 26
350.00
Oct. 29
250.00
Nov. 6
250.00
Nov. 11
250.00
Nov. 20
250.00
Nov. 27
250.00
Dec. 9
450.00
Dec. 30
500.00
Although not clear from the record, the inference is that the $5,000 September 18 deposit represented the amounts received from Lincoln National Life and the $4,500 July 16 deposit represented payments from R. R. Hedrick.
14. Petitioner's mathematically incorrect amount was computed as follows: ↩
TOTAL DEPOSITS
$19,231.26
(1) Returned Checks
(3,782.50)
(2) insurance Claims
North American Insurance
(350.00)
Employers Commericial
(1,000.00)
Aetna Ins. Co
(808.27)
(3) Georgia Power Refund
(469.24)
(4) Rebate from I. T. Cohen
(900.00)
(5) Additional Rebate
(500.00)
(6) Reimbursement for H & S Trip
(280.00)
(7) Distribution from H & S Sales
(350.00)
(8) Distribution from The Domino, Inc.
(3,350.00)
(9) Income Previously Recorded
(625.00)
(10) Loan Proceeds - National Bank of Georgia
(2,500.00)
15. Petitioner testified that his wife's bank account for 1969 reflects deposits that when added to the payments in issue here total $12,500. Records of the deposits in 1969 are not in evidence here, however, and we cannot ascertain if this relationship would be borne out. Presumably Domino's records of salary payments made were lost in the fire.↩
16. Petitioner testified, and we found as a fact, that payments on the option Kirk purchased were $250 per week and started in July 1970.Bach testified that the $1,750 debit entry on Domino's worksheet as a transaction during the year ended August 31, 1970 related to the $250 payments. This is just one example of the confusion and inconsistencies involved with the worksheets which go far to reduce their probative value. ↩
17. Respondent contends that to the extent the payments by Kirk represent repayment of loand by Domino's subsidiaries to petitioner, they nonetheless must be treated as dividends by Domino. Respondent bases his argument on Georgia law, which he contends states that a subsidiary is not liable for the parent's debt, relying on Trans-American Communications, Inc. v. Nolle, 134 Ga. App.457, 214 S.E.2d 717 (1975). We do not reach this issue since the payments made by Kirk were the property of Domino, and there is no evidence that the corporations adjusted their inter-company accounts or that the subsidiaries debited any amounts to their officer loan accounts.
18. Petitioner maintains that these are "net" amounts, reflecting the amounts repaid from Domino to petitioner net of additional loans from petitioner to Domino. ↩
19. Respondent alternatively argued that if we find that the advances were properly credited by Domino as repayments to petitioner, such repayments do not constitute loan repayments, but are taxable under section 301. This argument is based on his contention that the (alleged) advances by petitioner to Domino constituted contributions to capital, not loans. We do not need to reach this question, however, having already held for respondent on this issue.