T.C. Memo. 1998-391


UNITED STATES TAX COURT


SRICHAI AND PUSADEE RUNGRANGSI, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 11257-97.                    Filed November 4, 1998.


Srichai and Pusadee Rungrangsi, pro sese.

<u>Gretchen A. Kindel</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


JACOBS, <u>Judge</u>:  Respondent determined the following deficiencies, additions, and penalties with respect to petitioners' Federal income taxes:

| Year | Deficiency | Additions to Tax and Penalties | |
| | | Sec. 6651(a) | Sec. 6662 |
| --- | --- | --- | --- |
| 1992 | $8,517 | $100 | $1,703 |

| 1993 | 22,226 | 1,514 | 4,445 |
| 1994 | 19,178 | 673 | 3,836 |

All section references are to the Internal Revenue Code for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

The deficiencies herein generally relate to petitioners' ownership and operation of a restaurant in Stanton, California. The issues for decision are: (1) Whether a purported sale of a restaurant (Stanton Mexicatessen) from petitioners to Suvanee Eagatatt on September 15, 1993, should be recognized for tax purposes, so that petitioners would be entitled to a capital loss on the sale for that year; (2) whether petitioners properly reported the income from the operation of Stanton Mexicatessen for 1992, 1993, and/or 1994; (3) whether petitioners are entitled to deductions for investment interest expenses for 1992, 1993, and/or 1994; (4) whether petitioners are liable for additions to tax pursuant to section 6651(a) for failure to timely file their tax returns for 1992, 1993, and 1994; and (5) whether petitioners are liable for accuracy-related penalties pursuant to section 6662 for 1992, 1993, and 1994.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts are incorporated in our findings by this reference.

At the time the petition was filed, petitioners resided in Cerritos, California.

Background

Mr. Rungrangsi was born in Thailand in 1938. He first came to the United States in 1968 to attend Georgia State University where he obtained a master's degree in economics. After obtaining his degree, Mr. Rungrangsi returned to Thailand to work for the Thai government. In 1979, Mr. Rungrangsi married and he returned to the United States with Mrs. Rungrangsi and became a bartender in New York. In 1980, petitioners moved to southern California and Mr. Rungrangsi continued to work as a bartender; Mrs. Rungrangsi worked as a registered nurse.

After moving to California, petitioners began investing in real estate. In 1984, they acquired commercial property in Long Beach, California, and in 1987, they acquired a residence. In 1989, petitioners acquired a minimarket business in South El Monte, California, with the equity from their house. They invested approximately $120,000 to purchase the minimarket, but had insufficient funds to purchase inventory. Consequently, petitioners borrowed funds from Suvanee Eagatatt, a friend of Mrs. Rungrangsi. Ms. Eagatatt obtained a home equity loan of $96,000 and lent the proceeds to petitioners without interest. Petitioners were obligated to pay off the loan directly to Ms. Eagatatt's lender.

In 1991, petitioners sold the minimarket (at a profit) for $355,000.

Stanton Mexicatessen Restaurant

On January 7, 1992, petitioners purchased Stanton Mexicatessen, a restaurant located in Stanton, California, for $355,000 (an apparent coincidence) from Sonia Finkelstein. To pay for the restaurant, petitioners obtained a $100,000 loan from First International Bank (secured by petitioners' residence), received $85,000 in seller's financing (which was to be repaid at an interest rate of 10 percent by January 7, 1995), and paid the balance of the purchase price in cash, including the funds from Ms. Eagatatt's home equity loan.

Petitioners maintained two business checking accounts[1] for the operation of Stanton Mexicatessen. The first account (No. 0273-15832) was held at Sanwa Bank (the Sanwa business checking account). Petitioners, along with Somphob (Sam) Osathanond (petitioners' nephew who assisted in the operation of the restaurant), were signatories on this account. The second account (No. 04422-09516) was held at Bank of America. This latter account was opened on June 1, 1992, and closed on November 18, 1992. In operating the restaurant, petitioners did not deposit all cash

---

[1] Petitioners also maintained personal checking and savings accounts at Sanwa Bank, Bank of America, and First Central Bank.

receipts into the business checking accounts; often they used the receipts to make purchases (such as inventory).

In 1993, petitioners began to experience financial difficulties resulting in the foreclosure of a rental property. In contemplation of bankruptcy, on September 15, 1993, petitioner arranged for Ms. Eagatatt to sign and file a Notice To Creditors of Bulk Sale pursuant to the Uniform Commercial Code (the bulk sale notice) in Orange County, California, in which the assets of Stanton Mexicatessen were purportedly transferred to Ms. Eagatatt. (Petitioners received no monetary consideration for this transfer, but the bulk sale notice indicated that Ms. Eagatatt was to assume all liabilities of the restaurant.) Further, the lease for the land on which the restaurant operated was amended to reflect the transfer to Ms. Eagatatt.

On or about September 29, 1993, petitioners filed for bankruptcy protection from creditors. The record does not reflect the type of bankruptcy protection petitioners sought.

Preparing and Filing of Tax Returns

Petitioners' 1992, 1993, and 1994 joint income tax returns, all of which were untimely filed, were prepared by professional accounting firms. For 1992, petitioners reported on Schedule C, Profit or Loss From Business, a loss of $23,005 from the operation of Stanton Mexicatessen. Also for 1992, petitioners reported investment interest expenses of $12,221 on Schedule A, Itemized

Deductions. For 1993, petitioners reported on Schedule C a loss of $48,483 from the operation of Stanton Mexicatessen, and interest expenses of $10,277 on Schedule A. For 1994, petitioners did not file a Schedule C and did not report any income or loss from the operation of Stanton Mexicatessen.

Petitioners filed Form 4797, Sales of Business Property, for 1994 and reported a loss from the sale of Stanton Mexicatessen's assets of $123,557 (less a $4,712 gain from the disposition of other restaurant property for a net loss of $118,845). Form 4797 reported a sales date for the restaurant of January 1, 1994.

Notice of Deficiency

Respondent asserts that petitioners gave Ms. Eagatatt a security interest in the assets of Stanton Mexicatessen, as opposed to selling the restaurant to her. Accordingly, respondent determined that because petitioners did not sell Stanton Mexicatessen, they are not entitled to the claimed capital loss for 1994. As a consequence of that determination, respondent determined that petitioners failed to report the restaurant income for 1994, and further, that they underreported the restaurant income for 1992 and 1993. Respondent, therefore, reconstructed petitioners' restaurant income for each of the years in issue by determining the net profit from the restaurant as 3 percent of the restaurant's gross receipts (as reported by petitioners in 1992 and 1993, and as reported by Ms. Eagatatt in 1994).

Respondent also determined that petitioners were not entitled to claimed investment interest expense deductions for 1992 and 1993. Finally, respondent determined accuracy-related penalties pursuant to section 6662 for each of the years in issue and additions to tax pursuant to section 6651(a) for petitioners' failure to timely file their tax returns for each of the years in issue.[2]

OPINION

Issue 1. Sale of Restaurant

The first issue for decision concerns the nature of the transfer of Stanton Mexicatessen to Ms. Eagatatt, that is, whether petitioners sold the assets of the restaurant to Ms. Eagatatt, as petitioners assert, or merely gave her a security interest in the assets of the restaurant, as respondent maintains.

Preliminarily, we note that although petitioners reported the sale of the restaurant on their 1994 tax return, the transaction in fact occurred on September 15, 1993. (Petitioners maintain they reported the loss from the purported sale of the restaurant on their 1994 tax return on the advice of their accountant.) Because the transaction occurred in 1993, petitioners are not entitled to the loss in 1994, and we sustain respondent's determination for that adjustment for that year. See sec. 165(a). However, because

---

[2] Other adjustments in the notice of deficiency relating to self-employment taxes are computational and not in dispute.

we have jurisdiction over petitioners' 1993 tax year, we shall address petitioners' entitlement to a loss deduction in 1993. Sec. 6214.

Under section 165(a), taxpayers generally are entitled to deduct losses not otherwise compensated for by insurance or otherwise. Section 165(c) limits the deductions of noncorporate taxpayers to losses incurred in a trade or business activity, a for-profit activity, or casualty and theft losses.

To decide whether a taxpayer is entitled to a loss as the result of a sale which is a part of a trade or business or for-profit activity, we must first determine whether a sale is deemed to have occurred. "The term 'sale' is given its ordinary meaning for Federal income tax purposes and is generally defined as a transfer of property for money or a promise to pay money." Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981) (quoting Commissioner v. Brown, 380 U.S. 563, 570-571 (1965)). Whether a sale has occurred depends on the facts and circumstances. Haggard v. Commissioner, 24 T.C. 1124, 1129 (1955), affd. 241 F.2d 288 (9th Cir. 1956). The relevant factors to be considered include whether legal title passes; how the parties treat the transaction; and whether an equity was acquired in the property. See Grodt & McKay Realty, Inc. v. Commissioner, supra.

At trial, Mr. Rungrangsi testified that he sold Stanton Mexicatessen to Ms. Eagatatt on September 15, 1993, apparently in

order to place the restaurant's assets outside the reach of creditors. He asserted that he neither owned nor operated the restaurant after September 15, 1993, and that he thereafter considered Ms. Eagatatt to be the owner of the restaurant.

Based on the entire record, we conclude that no sale took place. Mr. Rungrangsi admitted that the restaurant's business license remained in petitioners' names after September 15, 1993. Indeed, the record is unclear when and if the license was ever changed. The business checking account at Sanwa bank was never changed to make Ms. Eagatatt a signatory thereon, or to remove petitioners as signatories. More importantly, petitioners continued to utilize the Sanwa business checking account after September 15, 1993, in the same manner as they had previously used the account--drafting checks out of the account and endorsing and depositing checks into the account.

During 1994, petitioners made deposits totaling $107,945.98 into the Sanwa business checking account and wrote checks totaling $52,238.21 for apparent business expenses out of the Sanwa business checking account. Further, during 1994 petitioners wrote checks to themselves or for personal expenses out of the Sanwa business checking account.

Even though the bulk sale notice indicated that Ms. Eagatatt would be responsible for all of Stanton Mexicatessen's liabilities, during 1994 petitioners continued to write checks to First

International Bank (which issued the $100,000 small business loan) and to Ms. Finkelstein (the seller who financed $85,000 toward the purchase of the restaurant) out of the Sanwa business checking account. (Mr. Rungrangsi admitted that the loan documents for First International Bank were never amended to reflect the assumption of the liabilities by Ms. Eagatatt and that he continued to make payments to the lenders.) No checks from any business checking account were ever written to Ms. Eagatatt.

We also note that Stanton Mexicatessen's Form 940-EZ, Employer's Annual Federal Unemployment (FUTA) Tax Return, dated February 28, 1994, and Form 941, Employer's Quarterly Federal Tax Return, dated February 25, 1994, were both signed by Mr. Rungrangsi and identified him as the owner.

Most compelling, however, is the testimony of Ms. Eagatatt. Although Ms. Eagatatt filed a Schedule C with her 1994 income tax return and reported a $6,291 loss from the operation of Stanton Mexicatessen, she conceded during an Internal Revenue Service (IRS) audit of her 1994 return that she was not entitled to the loss. Ms. Eagatatt testified that she knew nothing about the restaurant-- she had only visited the restaurant once and did not even know the address or generally what city the restaurant was located in. Further, she testified that she never received any money from the restaurant's operation.

Ms. Eagatatt explained that she lent petitioners proceeds from the equity in her house because she was a friend of petitioners and wanted to help petitioners with their business. At the time of the loan (for the purchase of the minimarket), Ms. Eagatatt was not aware that her house might be foreclosed upon if petitioners failed to repay. It was only later that Ms. Eagatatt discovered that she had no security if petitioners failed to make payments to Ms. Eagatatt's bank lender, so she asked petitioners to place the restaurant in her name. Thus, the purpose of placing the restaurant in Ms. Eagatatt's name was to give her a security interest in the restaurant's assets, and nothing more:

> Q. And when you signed the document, Exhibit 25-Y [the bulk sale notice], what was your intent?
>
> A. Just want to be the name in the restaurant.
>
> Q. Did you intend to buy the restaurant?
>
> A. I wanted the restaurant to be under my name, and I don't know how to do the restaurant. That's the only thing I want, the name under the restaurant.
>
>    *     *     *     *     *     *     *
>
> Q. If the business was sold [to a third party] for more than $94,000 [the outstanding balance of Ms. Eagatatt's home equity loan on September 15, 1993], did you expect to receive that full amount or just $94,000?
>
> A. Just for the equity--the equity loan, and that's it.
>
>    *     *     *     *     *     *     *
>
> Q. And who would get the proceeds that exceeded the $94,000?

A.   Whatever who want.   I don't--

Q.   Would that be Mr. Rungrangsi?

A.   Should be.

It is evident that the benefits and burdens of ownership of the restaurant were never transferred to Ms. Eagatatt, see Grodt & McKay Realty, Inc. v. Commissioner, supra, and petitioners continued to retain significant control over the restaurant and its operation, see Tolwinsky v. Commissioner, 86 T.C. 1009, 1041 (1986); see also Helvering v. Clifford, 309 U.S. 331 (1940); Hilton v. Commissioner, 74 T.C. 305 (1980), affd. 671 F.2d 316 (9th Cir. 1982); Miller v. Commissioner, 68 T.C. 767 (1977).  The transfer of the restaurant to Ms. Eagatatt was intended to create a security interest, see Hedrick v. Commissioner, T.C. Memo. 1980-54; see also Helvering v. F.& R. Lazarus & Co., 308 U.S. 252, 255 (1939), and it is well settled that the mortgaging of property does not constitute a sale or exchange, Woodsam Associates, Inc. v. Commissioner, 16 T.C. 649, 653-654 (1951), affd. 198 F.2d 357 (2d Cir. 1952); Lutz & Schramm Co. v. Commissioner, 1 T.C. 682, 689 (1943).  "[T]axation is not so much concerned with the refinements of title as it is with actual command over the property taxed--the actual benefit for which the tax is paid."  Corliss v. Bowers, 281 U.S. 376, 378 (1930).

To summarize, we find that the September 15, 1993, event was not a sale, and therefore we hold that petitioners are not entitled to a loss in connection therewith for either 1993 or 1994.

Issue 2.  Unreported Income for 1992-94

Having found that petitioners owned Stanton Mexicatessen after September 15, 1993, we proceed to decide the amount of income from the restaurant petitioners should have reported both before and after that date.

According to IRS Revenue Agent Julia Chang who conducted petitioners' examination, petitioners were unable to produce any books or records to substantiate the income and expenses for Stanton Mexicatessen for the years in issue, and none were introduced into evidence at trial.  Revenue Agent Chang testified that because of the large number of cash transactions, a bank deposits analysis was considered inappropriate.  Consequently, Revenue Agent Chang reconstructed petitioners' income from the restaurant by analyzing industry standards.  She utilized the RMA Annual Statement Studies 1994 for the relevant time period, which indicated that the industry standard for net profits before tax for restaurants with gross receipts of less than $500,000 was 3 percent of gross receipts.  Therefore, she reconstructed petitioners' net income for the restaurant based on the product of 3 percent of petitioners' reported gross receipts for 1992 and 1993.  For 1994,

Revenue Agent Chang utilized the gross receipts reported by Ms. Eagatatt.

Where taxpayers fail to maintain adequate books or records, the Commissioner is entitled to reconstruct the taxpayers' income through indirect methods. Holland v. United States, 348 U.S. 121, 134 (1954); Webb v. Commissioner, 394 F.2d 366, 371-372 (5th Cir. 1968), affg. T.C. Memo. 1966-81; Petzoldt v. Commissioner, 92 T.C. 661, 686-687 (1989). In the case herein, respondent utilized a variation of the so-called percentage markup method which is a permissible method of reconstructing income, see Bollella v. Commissioner, 374 F.2d 96 (6th Cir. 1967), affg. T.C. Memo. 1965-162; Bernstein v. Commissioner, 267 F.2d 879, 880 (5th Cir. 1959), affg. T.C. Memo. 1956-260; Stone v. Commissioner, 22 T.C. 893, 905-906 (1954), and has been applied in situations involving restaurants, see Edgmon v. Commissioner, T.C. Memo. 1993-486; DiLando v. Commissioner, T.C. Memo. 1975-243. We have previously sustained deficiency determinations where the Commissioner has applied the percentage markup method based on a percentage of gross receipts. See Ginzburg v. Commissioner, 14 B.T.A. 324 (1928); Klebanoff v. Commissioner, T.C. Memo. 1973-174.

Petitioners did not introduce any evidence to establish the correct amounts of their income. Instead, Mr. Rungrangsi, in questioning Revenue Agent Chang, attempted to challenge her basis for using the percentage markup method and her failure to contact

him directly (rather than his accountants) for information about the restaurant.[3]

Petitioners failed to present any credible evidence that shows respondent's determination was erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). In general, we do not look behind the notice of deficiency and consider the actions or determinations of a revenue agent, and we shall not do so here. See Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 327-328 (1974). Thus, we sustain respondent's determination relating to the reconstruction of petitioners' income for the operation of Stanton Mexicatessen for each of the years in issue.

Issue 3. Interest Expenses

The third issue for decision is whether petitioners are entitled to investment interest expense deductions for 1992 and 1993 (and which, according to the notice of deficiency, have carryover consequences to 1994).

Respondent disallowed $12,221 of interest expenses in 1992 and $10,277 of investment interest expenses in 1993 as deductions because petitioners failed to substantiate the expenses or establish their entitlement to such deductions. Petitioners contend that the disputed interest expenses represent interest paid pursuant to the loans from First International Bank (for the small

---

[3] We note that Revenue Agent Chang worked with petitioners' accountants because Mr. Rungrangsi signed a power of attorney to the accountants.

business loan) and Ms. Finkelstein (for the restaurant acquisition financing).

Section 163 generally allows the deduction of interest paid on indebtedness during the taxable year. Section 163(d)(1) limits the deduction for investment interest to the extent of net investment income. Investment interest means interest paid on indebtedness allocable to property held for investment. Sec. 163(d)(3)(A). Property held for investment includes any interest held by the taxpayer involving the conduct of a trade or business which is not passive activity and with respect to which the taxpayer did not materially participate. Sec. 163(d)(5)(A)(ii). Net investment income means investment income (gross income from property held for investment and net gain from the disposition of property held for investment) over investment expenses. Sec. 163(d)(4)(A) and (B).

Petitioners have not shown that they received any offsetting investment income during 1992 or 1993. Thus, they are not entitled to a deduction for investment interest expenses for those years. Cf. Scott v. Commissioner, T.C. Memo. 1997-507. Arguably, the interest expenses paid by petitioners were not for investment interest, but were instead for interest indebtedness incurred in the operation of a trade or business and which is not subject to limitation under section 163. See King v. Commissioner, 89 T.C. 445, 463 (1987); Paoli v. Commissioner, T.C. Memo. 1988-23. But if the interest expenses were for trade or business indebtedness, such

expenses would already be allowed and provided for in the reconstruction of petitioners' restaurant income. And, in fact, petitioners did report on Schedules C interest expenses of $9,938 for 1992 and $12,100 for 1993. Thus, to both allow deductions for these interest expenses on Schedules C and for trade or business interest expenses on Schedules A would amount to the allowance of double deductions. Consequently, respondent's determination disallowing $12,221 of interest expenses for 1992 and $10,277 of interest expenses for 1993 is sustained.

Issue 4.  Failure To File Additions to Tax

The fourth issue for decision is whether petitioners are liable for the addition to tax pursuant to section 6651(a)(1) for failing to timely file their income tax returns for each of the years in issue.

Section 6651(a)(1) imposes an addition to tax of 5 percent for each month or fraction thereof in which an income tax return is not filed after the prescribed filing date. An exception is made for reasonable cause not due to willful neglect.

Although the record on this issue is vague, petitioners concede that they did not timely file their tax returns for the years in issue. Respondent contends that the 1992 return was filed on August 18, 1993, the 1993 return was filed on June 1, 1994, and the 1994 return was filed on May 14, 1995.

Petitioners assert that they were entitled to automatic 4-month extensions for the filing of their returns for each of the years in issue. In order to obtain an automatic 4-month filing extension, the taxpayer must satisfy three requirements. The taxpayer must: (1) Prepare and sign Form 4868, Application For Automatic Extension of Time to File U.S. Individual Income Tax Return; (2) file Form 4868 on or before the date on which the tax return is due; and (3) properly estimate the tax due for such taxable year and remit the unpaid balance. Condor Intl., Inc. v. Commissioner, 98 T.C. 203, 224 (1992), affd. in part and revd. in part on other grounds 78 F.3d 1355 (9th Cir. 1996); see also sec. 1.6081-4, Income Tax Regs.

Petitioners did not offer any copies of Forms 4868 for the years in issue or other evidence to establish that they satisfied the requirements for obtaining the automatic extension. Moreover, they offered no proof as to whether they had reasonable cause for failing to timely file their returns. Thus, we sustain respondent's determination as to the addition to tax pursuant to section 6651(a) for each of the years in issue.

Issue 5. Accuracy-Related Penalties

The final issue for decision is whether petitioners are liable for the accuracy-related penalty due to negligence or disregard of rules or regulations pursuant to section 6662 for each of the years in issue.

Section 6662 imposes an accuracy-related penalty equal to 20 percent of the portion of the underpayment attributable to negligence or disregard of rules or regulations. "Negligence" means any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue Code, and "disregard" means any careless, reckless, or intentional disregard. Sec. 6662(c); see also Neely v. Commissioner, 85 T.C. 934, 947 (1985).

No accuracy-related penalty is imposed with respect to any portion of the understatement in which the taxpayer acted with reasonable cause and in good faith. Sec. 6664(c)(1).

Mr. Rungrangsi testified that he relied on his accountants in preparing the tax returns for the years in issue. However, he did not establish that he provided his accountants with all the information necessary for them to prepare petitioners' returns properly. Petitioners' accountants did not testify at trial, and the parties stipulated that petitioners did not have any books or records reflecting the income or expenses of Stanton Mexicatessen for the years in issue.

Reliance on an accountant to prepare tax returns is not sufficient by itself to establish reasonable cause. See Metra Chem Corp. v. Commissioner, 88 T.C. 654, 662 (1987). The taxpayer must also show that he supplied the tax preparer with complete and accurate information so that the return could be properly prepared, an incorrect return was the result of the tax preparer's mistakes,

and the taxpayer in good faith relied on the advice of a competent tax preparer. <u>Jackson v. Commissioner</u>, 86 T.C. 492, 539-540 (1986), affd. 864 F.2d 1521 (10th Cir. 1989). Petitioners have not established that they acted with reasonable cause and in good faith in relying on their accountants to prepare their tax returns for the years in issue; they have also failed to demonstrate that they maintained books and records in accordance with section 6001. Consequently, we hold that petitioners are liable for the accuracy-related penalty pursuant to section 6662 for each of the years in issue.

To reflect the foregoing,

<u>Decision will be entered</u>
<u>for respondent</u>.